**Jeffrey Roger MIMS and Frederick Burton et al.**

v.

**Milton SHAPP, Governor of the Commonwealth of Pennsylvania William B. Robinson, Commissioner for the Bureau of Correction for the Commonwealth of Pennsylvania and James F. Howard, Warden of the State Correctional Institution at Pittsburgh, et al.**

**Civ. A. No. 74-1101.**

United States District Court,
W. D. Pennsylvania.

Aug. 23, 1978.

Paul R. Gettleman, Pittsburgh, Pa., for plaintiffs.

John M. Duff, Deputy Atty. Gen., Frederick R. Nene, Asst. Atty. Gen., Pittsburgh, Pa., for defendants.

## OPINION ON MOTION FOR PRELIMINARY INJUNCTION

WEBER, Chief Judge.

This court must now decide whether the Commonwealth of Pennsylvania may continue to confine plaintiff Frederick Burton in the "Behavioral Adjustment Union" (BAU) of the Western Penitentiary (also known as SCI Pittsburgh).

Frederick Burton, now serving sentences for two unrelated homicides, has moved for an injunction requiring the responsible prison official to release him from the BAU into the general prison population. After a hearing and argument on the motion, we conclude that some immediate relief must be ordered.

On May 31, 1973, Frederick Burton was serving his first sentence for homicide[1] in Holmesburg Prison. Together with another inmate, Joseph Bowen, he was admitted to the office of Deputy Warden Frumhold. Both Frumhold and Warden Curran were stabbed to death in the confrontation which immediately followed. As a result of the incident Burton was transferred to Graterford Prison and then to Western Penitentiary in Pittsburgh; in both institutions he was confined in the BAU, the most secure and spartan area of the prison. Except for some time spent in Graterford during his trial for participating in the Holmesburg stabbing, Burton has remained in the Western Penitentiary BAU until the present.[2]

No hearing was held before Burton's initial confinement in the BAU. Late in 1975, prison authorities began regular, monthly reviews of Burton's status. The notes of these reviews, conducted by the Program Review Committee (PRC), composed of certain prison officials, reveal that the outcome was always the same. Burton would remain in the BAU, at first until his trial and, later, he would remain there for another 30 days.[3] The recommendations of the PRC were submitted each time to the Warden, Mr. Howard, who invariably agreed that Burton should remain in the BAU. In reaching this conclusion the Warden testified that he relied on Burton's involvement in

"[t]he murder of the warden and—prison warden and deputy warden within the

confine of Holmesburg Prison. The fact that some of our staff felt Mr. Burton was an extremely dangerous individual, and a fact that I personally agreed with, and for this reason it was my decision that Mr. Burton would remain confined in the BAU in our institution until there was some indication that there was some change in his attitude, his conduct, his overall attitude basically." Tr. 98–98.

His conclusion was bolstered by what he perceived, in personal contacts with Burton as his "rather cold attitude, his unwillingness to cooperate, his apparent satisfaction with being in the BAU. His lack of demands." Tr. 107. The Warden did agree with the PRC that Burton's behavior while he was in the BAU had been good, even "exemplary." Also, it is clear from cross-examination of the warden and from the fact that Burton was one of the original plaintiffs in this suit that he could not reasonably be considered to have been at all satisfied with being in the BAU. Finally, Burton's unwillingness to answer questions posed by prison officials about the Holmesburg incident prior to his conviction and sentence was a response to the sensible advice of his counsel not to say anything about it; we cannot consider this as an example of an unwillingness to cooperate.

The Commissioner of Corrections, Mr. Robinson, testified to substantially the same effect: that Burton's confinement in the BAU was required for security reasons, a conclusion based only on his "past criminality." Tr. 267, 275. No plans have been developed to reintroduce Burton gradually in the prison population. Tr. 275. At no time has Burton been informed of specific criteria by which his eligibility for a return to general population would be judged, nor has he been allowed any extra contacts with the world outside the BAU in which he might demonstrate to the prison authorities

---

1. See 459 Pa. 550, 330 A.2d 833 (1974).

2. In 1976 Burton was convicted in a jury trial conducted before the Hon. Prattis, J., of the Court of Common Pleas for Philadelphia County, September Term 1973, Nos. 41–44, unpublished opinion dated March 17, 1977. Burton's appeal of this conviction, which apparently is

for the killing of the deputy warden, is still pending before the Supreme Court of Pennsylvania.

3. These hearings are required by state regulations, Bureau of Corrections Administrative Directive 801, 37 Pa.Code Chp. 95.103(h)(4).

**250**

that he no longer represented a significant security risk.

Burton bases his claim that his prolonged confinement in the BAU should be ended by this Court on the Eighth Amendment prohibition against cruel and unusual punishment and on the Due Process clause of the Fifth Amendment.

In cases such as this, federal courts must be

"extremely reluctant to limit the freedom of prison officials to classify prisoners as they, in their broad discretion, may deem appropriate. [citations omitted].

State penitentiaries are occupied by convicted felons, either ineligible for or found to be unworthy of probation. By its very nature, the operation of such a prison is a dangerous undertaking. Time and time again, experience has dramatically taught that the management and control of prisons, the prevention of mass violence within prisons, and the safe retention of convicts within prison walls, present problems of the first magnitude, in which failures occur all to often . . . .

The authority to manage and control a felony prison should never be unduly restricted or divided. That authority must repose in one well identified place, limited only by the requirements of the law." *Newman v. Alabama,* 559 F.2d 283, 287 (5th Cir. 1977).

First we note that the conditions in the BAU at Western Penitentiary are not so shockingly inadequate as to constitute in themselves cruel and unusual punishment of prisoners confined there. Nor could we conclude, on this record, that any specific condition in the BAU is so unrelated to the legitimate objective of "administrative segregation"—minimizing any possible security risk posed by these inmates—as to be unacceptable under the Eighth Amendment analysis employed by Judge Luongo in *United States ex rel Hoss v. Cuyler,* 452 F.Supp. 256 (E.D.Pa.1978). Finally, although the Commonwealth apparently concedes that lengthy confinement in the BAU is probably psychologically damaging, we do

not find that Burton's confinement there, even for five years, has been cruel and unusual punishment simply because of these psychological effects, which have not been severe in Burton's case. We consider it highly significant that Burton was kept in segregation because of a good faith belief by prison officials that he represented a security risk Whether the standards which they applied to make that determination were constitutionally acceptable under the due process clause is, in light of these conclusions, the only crucial question before this court. We must decide whether, applying appropriate standards to the facts established at the recent hearing, the prison authorities are now justified in keeping Burton in the BAU.

The most recent evidence on this central factual point is the report of Superintendent Howard, prepared at the direction of this court at the conclusion of our recent hearing. After reviewing fresh reports by a psychologist, Burton's prison counselor and the Director of Treatment at SCI Pittsburgh, Warden Howard concluded that Burton should remain in the BAU.

". . . This decision is based on the following factors: (1) Mr. Burton has been involved in the brutal and calculated murders of three individuals who represented the Criminal Justice System. Mr. Burton's initial confinement was the result of the murder of a Police Officer in the City of Philadelphia. Subsequently, he was involved in the murder of a Warden and Deputy Warden of the Holmesburg Prison in the City of Philadelphia. All three of these episodes, according to the records available, were well planned, calculated and efficient executions of individuals with whom he maintained no personal relationship but were representatives of the Criminal Justice System. (2) This individual, prior to his introduction into a life of criminality, maintained what one would consider to be a rather middle class relationship. Obviously, something occurred to provide a drastic change in this man's life style. Through many years of confinement at this insti-

tution, professionals in the field of criminology had been unable to determine the significant factors that initiated this change. To this date, Mr. Burton has successfully veiled what we consider his true emotions, and Staff members have only been able to 'scratch the surface of his real feelings.' (3) Mr. Burton has consistently identified with individuals and groups which appear to be dedicated to the violent or nonviolent overthrow of the American system of life. In my personal contacts with him and his associates, both have exposed [sic] a philosophy of dedicated revolutionaries. (4) This individual, contrary to all judicial documentation, consistently insists on total innocence of all charges. This particular attitude, which is in complete conflict with eye witness descriptions of the incident at Holmesburg, raises some very serious questions as to remorse but more importantly as to genuine trust. This type of attitude, which we find common in individuals who are totally unresponsive to society's mores and standards, predicts an extreme degree of dangerousness for all individuals to whom he may have future contact. (5) Finally, and probably most important, it is my personal belief based on 20 years of correctional experience that Mr. Burton continues to be an extreme threat to the welfare and safety of Staff and inmates at the State Correctional Institution at Pittsburgh. I am of the opinion that Mr. Burton is capable of acting out in a violent manner when, in his opinion, it is justified and the results of this acting out would seriously threaten the security of this institution. I believe that Mr. Burton feels absolutely no remorse for his actions and in his own mind can justify whatever has to be done to meet his cause."

Analysis of this report requires us to conclude that no new objective evidence of Burton's present dangerousness has been adduced in this re-evaluation. Point 1 merely cites Burton's past criminal record. Point 2 is no more than an assertion that the Warden doesn't understand how an individual with a good background has acquired a criminal record. Point 3 was the subject of some testimony at the hearing. The Warden could not then testify to any factual basis for this conclusion and its repetition does not add to its weight. Point 4, the Warden's conclusion that inmates who refuse to admit guilt are more likely to be dangerous, can be given little weight because no factual basis for this conclusion is cited. Neither does Point 5 add anything of a factual nature to support the Warden's recommendation.

Finally, as Burton's counsel has correctly pointed out, the prison authorities have never given any weight to the undeniable fact that Burton's behavior while in the BAU was very good.[4]

■ The leading case in the area of due process limitations on administrative segregation of prisoners for security reasons is *Kelly v. Brewer*, 525 F.2d 394, 400 (8th Cir. 1975).

"While, as stated, administrative segregation is not inherently unconstitutional, its validity depends upon the relative humaneness of the conditions of the segregated confinement and in individual cases upon the existence of a valid and subsisting reason or reasons for the segregation . . . It goes without saying that a prison warden may not constitutionally put an inmate in administrative segregation, involving solitary confinement or other rigorous conditions of imprisonment, simply because he dislikes the inmate or desires to punish him for past misconduct. Moreover, it should be emphasized that the reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation. Conditions in prisons change as they do everywhere else, and a reason for administrative segregation of an inmate that is valid today may not necessarily be valid six months or a year in the future."

---

4. That opportunities for violence do exist in the BAU is demonstrated by the amount of havoc Stanley Hoss managed to create while confined there. See *Hoss, supra.*

Thus, the Court of Appeals held, past criminality of an inmate cannot alone justify his indefinite stay in administrative segregation. Furthermore, the state has an obligation, insofar as possible to base its assessment of the security risk posed by a given inmate on objective factors. See *Hoss, supra*, 452 F.Supp. at 293. These criteria should also be clearly explained to the inmate affected.

■■ In following *Brewer v. Kelly, supra*, and *Hoss, supra*, we conclude that the Commonwealth has failed to give Burton these minimum due process protections by its subjective evaluation of his conduct and by its denial of opportunities for him to demonstrate good behavior outside the BAU. Because we must give great deference to the experience and judgment of prison authorities, we will not substitute our judgment for theirs at this time. Rather we believe that the state must immediately develop criteria for objectively evaluating the future or potential danger posed by Burton, giving due consideration to his good record while in the BAU, and that these criteria must be communicated to Burton. Finally, because Burton has been in the BAU so long and because his conduct there has not in the past been given any weight as an indicator of his future good behavior, we must require the Commonwealth to develop immediately a program for allowing Burton to spend a significant portion of each week participating in activities, in which he may demonstrate the "changed attitude" on which the prison authorities place so much emphasis. For example, Burton could be allowed to work at some tasks within the BAU but outside his cell or to participate under strict supervision, in classes or job training for a few hours each day.[5]

Again we emphasize that the purpose of the procedures required by our order will be to minimize the weight, in the authorities' own judgment, given to Burton's past conduct by increasing the amount of available information as to his present attitude and behavior.

Whether intermediate stages of security housing exist in the Pennsylvania prison system, either at SCI Pittsburgh or elsewhere, has been disputed. Counsel indicated that such facilities, significantly more secure than general population but less secure than any BAU, did exist. If such facilities were available elsewhere we would require the transfer of the plaintiff, but in light of the testimony of Commissioner Robinson that none do exist we cannot so order.

## ORDER

AND NOW this *23rd day of August, 1978*, after hearing thereon, it is

ORDERED that the Defendants William B. Robinson, Commissioner for the Bureau of Corrections for the Commonwealth of Pennsylvania, and James F. Howard, Superintendent of the State Correctional Institution at Pittsburgh, are hereby commanded and enjoined to initiate action with regard to the continued confinement of Frederick Burton in the Behavioral Adjustment Unit at the State Correctional Institution in Pittsburgh, in the following particulars:

1. On or before September 12, 1978, Defendants Commissioner Robinson and Superintendent Howard shall submit to the Court a report of a program allowing Plaintiff Burton a significant number of hours per week in activity outside the BAU in job training, education, or employment, which will allow said Defendants to develop and apply objective criteria for his status in the prison population.

2. By September 12, 1978, the said Defendants shall place said plan in operation.

3. By September 12, 1978, Defendants shall deliver to Plaintiff Burton and to his counsel, a written statement of the criteria by which his eligibility for further release

---

5. We recently received a letter from Burton's counsel that he was permitted at some time within the last month to spend five days in general population. Such "test periods" must be the most reliable way of determining whether Burton would be significantly more dangerous in a less controlled environment than in the BAU.

from the restrictions of BAU confinement will be judged, and the nature of any intermediate stages of confinement which he may expect upon satisfactory behavior in the program required herein.

4. Ninety days after September 12, 1978, Plaintiff Burton shall be evaluated under the criteria established in the report required and a written report of such evaluation shall be furnished to him.

5. Said evaluations shall be made by the Program Review Committee, and shall be made at intervals of not more than ninety days thereafter until Frederick Burton shall have been admitted to the general prison population.