Jeffrey Roger MIMS, John James Keen, Edward X. Sistrunk, Glenn X. Jordan, Fred Burton, Vivian Richbourg, David Scoggins, Frank Patterson, Clifford Futch, all prisoners at the State Correctional Institution at Pittsburgh, Pennsylvania (hereinafter referred to as S.C.I. Pgh.)—all who were or are presently confined to the Behavioral Adjustment Unit, [Hereinafter known as the B.A.U.), on behalf of themselves and all those similarly situated in the B.A.U.

v.

Milton SHAPP, Governor of the Commonwealth of Pennsylvania, Israel Packel, Attorney General for the Commonwealth of Pennsylvania, Stewart Werner, Commissioner of the Bureau of Corrections for the Commonwealth of Pennsylvania, James Howard, Warden of the State Correctional Institution at Pittsburgh, Charles Zimmerman, Deputy Warden of the State Correctional Institution at Pittsburgh, William Jennings, Deputy Warden of the State Correctional Institution at Pittsburgh, Lawrence Weyandt, Major of the Guards at the State Correctional Institution at Pittsburgh, Pennsylvania, John Jasak, Captain of the Guards at the State Correctional Institution at Pittsburgh, Pennsylvania, David Young, casework Supervisor at the State Correctional Institution at Pittsburgh, Pennsylvania, Charles Kozakiewcz, Lieutenant of the Guards of the State Correctional Institution at Pgh. in charge of Prison security, James Robles, Sergeant of the Guards of the SCI Pgh. in Charge of the B.A.U., Sergeant Caruthers, Sergeant of the Guards of the SCI Pgh. in charge of the B.A.U., Their Agents, Subordinates and Employees.

Frederick BURTON

v.

William B. ROBINSON, Individually and in his official capacity as Commissioner of Corrections of the Commonwealth of Pennsylvania, together with his

Agents and Successors in Interest Stewart Werner, Individually and in his former official capacity as Commissioner of Corrections of the Commonwealth of Pennsylvania, Robert L. Johnson, Individually and in his former official capacity as Superintendent of the State Correctional Institution at Graterford, Graterford, Pennsylvania, Julius T. Cuyler, Individually and in his official capacity as Superintendent of the State Correctional Institution at Graterford, together with his Agents and successors in Interest Joseph Brierly and Gilbert A. Walters, Individually and in their former official capacities as Superintendent of the State Correctional Institution at Pittsburgh, Pittsburgh, Pennsylvania, and James E. Howard, individually and in his official capacity as Superintendent of the State Correctional Institution at Pittsburgh, together with his Agents and Successors in Interest.

Appeal of Milton SHAPP, Governor of the Commonwealth of Pennsylvania, et al.

No. 83–5906.

United States Court of Appeals, Third Circuit.

Argued Aug. 13, 1984.

Decided Sept. 17, 1984.

Rehearing Denied Oct. 12, 1984.

LeRoy Zimmerman, Atty. Gen., Jose' Hernandez-Cuebas, Deputy Atty. Gen., Andrew S. Gordon, Sr. Deputy Atty. Gen. (argued), Allen C. Warshaw, Sr. Deputy Atty. Gen., Chief, Litigation Section, Louis Anstandig, Egler, Anstandig, Garret & Riley, Pittsburgh, Pa., for appellants.

Paul R. Gettleman, (argued), Eleanore N. Gettleman, Zelienople, Pa., for appellees.

Before ALDISERT, Chief Judge, WEIS, Circuit Judge, and RE, Judge.*

## OPINION OF THE COURT

ALDISERT, Chief Judge.

This appeal is brought by Pennsylvania prison officials, defendants below, from a judgment and damages award entered in favor of a state prisoner. The action was commenced under 42 U.S.C. § 1983 and tried without a jury. We must decide whether the district court erred in determining that defendants violated the prisoner's due process rights by denying him meaningful periodic review during segregated confinement for five years.

This case was before us in a previous appeal, No. 82–5107. A panel opinion, written by the author of this opinion, affirmed the judgment of the district court on November 29, 1982. But prior to the issue of this court's mandate, the court *in banc*, responding to a petition for rehearing and considering an intervening decision of the Supreme Court, vacated the district court judgment in favor of the plaintiff prisoner and remanded the proceedings for reconsideration in light of *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). *Mims v. Shapp*, 702 F.2d 453 (3d Cir.1983). On remand, the district court reaffirmed its judgment, concluding that *Hewitt* did not command a change in its original disposition. 574 F.Supp. 637. We now reverse.

## I.

The relevant facts are undisputed. In May 1973, plaintiff Frederick Burton was an inmate in Philadelphia's Holmesburg prison serving a sentence for first degree murder of a police officer. *See Commonwealth of Pennsylvania v. Burton*, 459 Pa. 550, 330 A.2d 833 (1974).[1] While at Holmesburg Burton participated in the killing of the Deputy Warden.[2] Immediately after this incident, Burton was transferred, first to the state prison in Graterford, and then to Western Penitentiary in Pittsburgh. He was placed in solitary confinement—officially known as administrative segregation—in the Behavioral Adjustment Unit (BAU) in both prisons. Burton remained in administrative segregation in Western Penitentiary for more than five years until his release, by court order, into

---

* Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sitting by designation.

1. Police officer Von Colln was shot to death at the Cobbs Street Guardhouse of Philadelphia's 93rd Police District.

 On the basis of information apparently given to them by Marie Williams, wife of Hugh Sinclair Williams, police concluded that the crime was the work of a gang known as "The Revolutionaries," which included her husband, Alvin Joyner, Robert Joyner, Richard Thomas, Russell Shoats, and appellant Frederick Burton. Appellant was arrested, and after a warrant was obtained, a search of his home disclosed a number of spent cartridges, a 9-millimeter shell, a fragmentation grenade similar to those found at the murder scene and a 24" by 20" drawing of a police sergeant on his knees with a black militant holding a gun to his head, with the caption, "This Now." Appellant was tried by a judge and jury and found guilty of murder in the first degree, assault with intent to murder, and conspiracy for his role in the conspiracy which led to the killing of Officer Von Colln.

 *Commonwealth v. Burton*, 459 Pa. at 554, 330 A.2d at 835 (footnote omitted).

2. On June 8, 1976, a jury found Burton guilty of one count of second degree murder and was sentenced to life imprisonment. *Commonwealth of Pennsylvania v. Burton*, 491 Pa. 13, 417 A.2d 611 (1980).

the general prison population in September 1978.

While confined in the BAU at Western Penitentiary, Burton's treatment was undeniably severe. He was not allowed to work during his five years of confinement, and was permitted only two showers and one change of clothing per week. He ate all meals in his cell, slept on the floor because his mattress did not fit on the concrete slab bed, and, although permitted to exercise outside his cell for a minimal time each day, he was forced to undergo a thorough and degrading strip and body cavity search after each such temporary release. *See* Brief for Appellee at 14.

Although no hearing preceded his assignment to the BAU at either Graterford or Western Penitentiary, by late 1975, prison authorities at Western Penitentiary began regular monthly reviews of Burton's administrative segregation status through the Program Review Committee (PRC). The PRC consistently recommended that Burton remain in the BAU for an additional thirty days, and these recommendations were approved by the Warden, Mr. Howard. At no time prior to his release from the BAU in 1978 did the Western Penitentiary authorities develop plans to introduce Burton into the general prison population; at no time was Burton informed of specific criteria by which his eligibility for a release to the general prison population would be judged. *Mims v. Shapp,* 457 F.Supp. 247, 249–50 (W.D.Pa.1978) (opinion issued with order granting motion for preliminary injunction).

Burton brought this suit in 1975, alleging, *inter alia,* that his continued confinement in the BAU violated his due process rights under the Constitution and demanding declaratory and injunctive relief, compensatory and punitive damages, and attorney's fees. In August 1978, the district court granted Burton's motion for a preliminary injunction, concluding that his rights were violated by the circumstances of his confinement. This led to Burton's release from the BAU in September 1978. In No-

vember 1980, the district court awarded Burton $6,700 in compensatory damages and in December 1981, awarded him $8,200 in attorney's fees.

Appellants do not appeal from the grant of injunctive relief but challenge these last two orders arguing that: (1) they did not violate appellee's constitutional rights; (2) even if they did, then they are not liable for damages because they are protected by qualified executive immunity; and (3) if they are not so protected, then the damage award is error because the district court failed to find that plaintiff's confinement was unjustified and it wrongly assessed liability from January to September 1978. Because we determine that there was no violation of Burton's constitutional rights, we will not meet appellants' second and third contentions.

## II.

Appellants contend that the trial court erred in holding that Burton suffered deprivation of his constitutional right to due process. Our review of this determination by the district court is plenary as to that court's choice, interpretation and application of controlling legal precepts and subject to the clearly erroneous rule as to its findings of fact. *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 103 (3d Cir.1981); *Krasnov v. Dinan,* 465 F.2d 1298 (3d Cir.1972).

 Under the fourteenth amendment, the threshold question in determining whether there has been a deprivation of rights without due process is whether there is a protected interest at issue. *Meachum v. Fano,* 427 U.S. 215, 223, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Only then does the inquiry shift to whether the procedures employed to protect that interest were constitutionally adequate. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Here, Burton alleges a constitutional violation on the basis of the procedures used by the prison authorities

to keep him in administrative segregation.[3] This type of segregated confinement implicates a liberty interest cognizable under the fourteenth amendment. *Hewitt v. Helms*, 459 U.S. at 468, 103 S.Ct. at 870. As the *Hewitt* Court stated, the Pennsylvania regulations which establish administrative segregation also establish "a protected liberty interest [in the inmates] in remaining in the general prison population." *Id.* A protected interest being present, the focus of our analysis is whether the process afforded Burton satisfied fourteenth amendment requirements.

### III.

As the Supreme Court has noted, when a cognizable interest is at issue, the determination of what process is due

> generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903. The requirements of due process are thus necessarily "flexible and variable dependent upon the particular situation being examined." *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 12, 99 S.Ct. 2100, 2105, 60 L.Ed.2d 668 (1979). This is especially true in the prison context where the reach of the due process clause is highly restricted. As the Supreme Court has

stated, "one cannot automatically apply procedural rules designed for free citizens in an open society ... to the very different situation presented by a disciplinary proceeding in a state prison." *Wolff v. McDonnell*, 418 U.S. 539, 560, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974). And finally, it must be remembered that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979).

### A.

With these considerations in mind, the Supreme Court, in *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), addressed the question of what process was due a prison inmate at a hearing held to determine whether he should be subjected to administrative segregation. Following the three part analysis articulated in *Mathews v. Eldridge*, the Court concluded there was no due process violation. It reasoned that the prisoner's "private interest is not one of great consequence. He was merely transferred from one extremely restricted environment to an even more confined situation." *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 872. By contrast the Court noted that the "governmental interests are of great importance. The safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration." *Id.* Finally, it found that the administrative segregation decision would not be materially assisted by a detailed adversary proceeding as advanced by the prisoner.

---

**3.** Pennsylvania has adopted regulations establishing two basic types of restricted housing in its correctional facilities—disciplinary and administrative segregation. 37 Pa.Admin.Code § 95.107. Confinement in disciplinary segregation is imposed when an inmate has been found to have committed a misconduct violation. *Id.* § 95.106(2). Administrative segregation may be imposed when an inmate poses a threat to security, when disciplinary charges are pending against an inmate, or when an inmate requires protection. *Id.* § 95.104. Because the impact on a prisoner's liberty from segregated confinement is the same regardless of the reason for that confinement, we will assume for the purposes of this case that the conditions of the two types of confinement are substantially identical. *See Hewitt v. Helms*, 459 U.S. at 463 n. 1, 103 S.Ct. at 867 n. 1.

*Id.* Therefore, the Court held that the prison authorities "were obligated to engage only in an informal, nonadversary review of the information supporting [the prisoner's] administrative confinement ... within a reasonable time after confining him ...." *Id.*

### B.

Our concern in the present case is not with the process that is due for the initial segregated confinement decision, but rather with what process is due during the periodic reviews that determine whether the confinement should be continued. The *Hewitt* decision is instructive here as well. The Court in *Hewitt* cautioned that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates." 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. However, and highly relevant to the disposition of the case before us, the *Hewitt* Court noted that in making administrative segregation determinations, prison administrators could rely on "purely subjective evaluations and on predictions of future behavior." *Id.* at 472, 103 S.Ct. at 872 (quoting *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 464, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981)).

We now turn to the case at hand.

### IV.

The principal governmental interest in Burton's administrative confinement was the need to insure both the safety of the guards and other prisoners, and the internal security in the prison. These safety and security concerns are "perhaps the most fundamental responsibilit[ies] of the prison administration," *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 872, and are of particular importance in this case. Burton had been convicted of the murder of a police officer. And, while Burton was serving time in prison for this offense he participated in the killing of the Deputy Warden at the Holmesburg prison. Were the issue before us, we certainly would have little difficulty in concluding that the initial placement of Burton in the BAU was fully justifiable. Furthermore, we believe that the circumstances surrounding Burton's confinement in administrative segregation reflect a governmental interest more substantial than that which existed in *Hewitt.* [4]

Even with the heightened governmental interest existent in this case, Burton's correspondingly heightened private interest makes resolution of the due process issue difficult. As in *Hewitt,* Burton's private interest here is a limited right to remain in the general prison population rather than in a more restricted situation. As noted above, *Hewitt* concluded that, in terms of an initial segregated confinement decision, the inmate's private interest was not of great consequence because the transfer to administrative segregation was merely a temporary move to a more restrictive environment, a transfer that might be reasonably anticipated as a condition of confinement. But the inmate in *Hewitt* had been confined in administrative segregation less than two months, and then given a definite six month term of disciplinary segregation. Here, Burton was in solitary confinement for five years. The district court made a finding, which we conclude was not clearly erroneous, that the prison administrator had contemplated no change in Burton's status until the federal court intervened. Therefore, unlike the situation in *Hewitt,* Burton's confinement under administrative segregation was of potentially limitless duration. We agree with the district court

---

4. Helms' misconduct consisted of assaulting a prison official during a prison riot. While such conduct poses a grave threat to prison security, we believe that the crime for which Burton was convicted constitutes an even more serious threat to the safety of all persons within the prison. Although we hesitate to weigh the relative seriousness of Burton's and Helms' respective prison misconduct, we do consider it significant that Burton's conduct resulted in a conviction for second degree murder while the Commonwealth of Pennsylvania dropped all criminal charges against Helms.

that, because of the indefinite nature of the deprivations incident to Burton's continued confinement, Burton possessed a more significant liberty interest for due process analysis than that attributed to the prisoner in *Hewitt.*

Because Burton's private interest was relatively greater than that of the inmate in *Hewitt* and because the compelling nature of the governmental interest here exceeds that in *Hewitt,* determining the adequacy of the periodic review procedures employed by appellants becomes a difficult task. The question as to the adequacy of these procedures is a close one.

### V.

As noted above, the district court found that the procedures used by the prison authorities to keep Burton in confinement included PRC review of his administrative segregation status every thirty days. In evaluating whether the utilization of these procedures comported with the demands of the fourteenth amendment, the district court placed special significance on a report prepared by Warden Howard at the request of the court. This report listed several justifications to support Burton's continued BAU confinement.[5] The district court also relied on oral testimony of both Warden Howard and Pennsylvania Corrections Commissioner Robinson. Howard testified that in affirming the PRC's monthly recommendations he relied on Burton's involvement in "[t]he murder of the warden and ... deputy warden within the confine of Holmesburg Prison [and t]he fact that some of our staff felt Mr. Burton was an extremely dangerous individual, ... a fact that I personally agreed with ...." 457 F.Supp. at 249. Robinson testified that Burton was committed to solitary confinement because of his "past criminality." *Id.* Howard also expressed a feeling of uneasiness with Burton's initially uncommunicative behavior while in the BAU. This feeling was based on what he perceived as Burton's "rather cold attitude, his unwillingness to cooperate, his apparent satisfaction with being in the BAU. His lack of

---

**5.** In the report Howard stated:

This decision is based on the following factors: (1) Mr. Burton has been involved in the brutal and calculated murders of three individuals who represented the Criminal Justice System. Mr. Burton's initial confinement was the result of the murder of a Police Officer in the City of Philadelphia. Subsequently, he was involved in the murder of a Warden and Deputy Warden of the Holmesburg Prison in the City of Philadelphia. All three of these episodes, according to the records available, were well planned, calculated and efficient executions of individuals with whom he maintained no personal relationship but were representatives of the Criminal Justice System. (2) This individual, prior to his introduction into a life of criminality, maintained what one would consider to be a rather middle class relationship. Obviously, something occurred to provide a drastic change in this man's life style. Through many years of confinement at this institution, professionals in the field of criminology had been unable to determine the significant factors that initiated this change. To this date, Mr. Burton has successfully veiled what we consider his true emotions, and Staff members have only been able to "scratch the surface of his real feelings." (3) Mr. Burton has consistently identified with individuals and groups which appear to be dedicated to the violent or non-violent over-

throw of the American system of life. In my personal contacts with him and his associates, both have espoused a philosophy of dedicated revolutionaries. (4) This individual, contrary to all judicial documentation, consistently insists on total innocence of all charges. This particular attitude, which is in complete conflict with eye witness descriptions of the incident at Holmesburg, raises some very serious questions as to remorse but more importantly as to genuine trust. This type of attitude, which we find common in individuals who are totally unresponsive to society's mores and standards, predicts an extreme degree of dangerousness for all individuals to whom he may have future contact. (5) Finally, and probably most important, it is my personal belief based on 20 years of correctional experience that Mr. Burton continues to be an extreme threat to the welfare and safety of Staff and inmates at the State Correctional Institution at Pittsburgh. I am of the opinion that Mr. Burton is capable of acting out in a violent manner when, in his opinion, it is justified and the results of this acting out would seriously threaten the security of this institution. I believe that Mr. Burton feels absolutely no remorse for his actions and in his own mind can justify whatever has to be done to meet his cause.

457 F.Supp. at 250–51.

demands." [6] *Id.* By May 1977, however, after the completion of his trial for the Holmesburg stabbings, Burton's attitude apparently changed. Warden Howard commented that by this time Burton had become cooperative, informative and agreeable. *Burton v. Shapp,* 500 F.Supp. 760, 762 (W.D.Pa.1980) (opinion issued with order awarding compensatory damages). Notwithstanding this change in attitude, Burton remained in the BAU until his release pursuant to a federal court order in September 1978.

## VI.

■ We conclude that *Hewitt* validated the use of subjective evaluations by prison authorities. *Hewitt* thus severely undermines the position taken by the district court and the original panel that first reviewed this appeal to the effect that due process required, as an absolute, the use of objective standards by prison authorities in the periodic reviews of the initial confinement decision. The district court emphasized:

> [t]he only factual information available to the PRC and the Warden on the issue of Burton's potential for danger was his past misconduct. While this is not an insignificant fact, it may become somewhat less probative with the passage of time as circumstances change. No other objective evidence of Burton's propensity for violence was ever adduced. This is of particular import later in Burton's confinement as his misconduct recedes into the past and his conduct and attitude improve.

> . . . . .

> This [the periodic review] inquiry must seek facts relevant to the issue of whether the inmate continues to present a security risk. The use of objective standards for the measurement of conduct and attitude ensures meaningful review and prevents decisions based on guess-

work or vindictiveness. Such is the purpose of due process.

Dist. ct. op. at 6, 8, *reprinted in* app. at A–104, 106.

However attractive this approach may be, the Supreme Court now emphasizes that

> [i]n the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 464, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution.

*Hewitt,* 459 U.S. at 472, 103 S.Ct. at 872.

■ When prison officials are confronted with the kind of threat to internal security that Burton initially posed, the governmental interest in formulating good faith and reasoned responses to such threats—including the relatively drastic measure of administrative segregation—is compelling. It follows that the level of judicial deference to the prison officials' attempts to deal with such threats should be high. However, we acknowledge that the governmental interest involved in a good faith decision to subject a prisoner to administrative segregation may fluctuate with the passage of time and change of circumstances. The validity of the government's interest in prison safety and security as a basis for restricting the liberty rights of an inmate subsists only as long as the inmate continues to pose a safety or security risk. It was upon this basis that the *Hewitt* Court noted that periodic review

**6.** The district court found that Burton's unwillingness to communicate with prison officials was on the advice of counsel not to say anything related to the Holmesburg stabbings while that trial was pending. *See* 457 F.Supp. at 249.

of administrative segregation decisions is necessary. *Hewitt*, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9.

■ To insure that periodic review does not become simply a sham, the content and substance of that review must be scrutinized under the illumination of the fourteenth amendment. When so scrutinized, we are of the view that under the teachings of *Hewitt*, and the admittedly unusual circumstances of this case, the periodic review employed by appellants, which relied upon their subjective evaluations of Burton, comported with minimum constitutional standards.

We are strongly influenced by the specific conduct of the inmate here which heightened the governmental interest in restricting his liberty: while serving a long prison sentence for the wanton murder of a policeman, he participated in the killing of the deputy warden of the institution in which he had been confined. Under these facts, we cannot conclude as a matter of law that the type of periodic review administered in his case, placing a major emphasis on prison security and based on the subjective evaluation of prison officials, constituted a deprivation of constitutional rights to entitle Burton to an award of money damages. Accordingly, we will reverse the district court's award of money damages to Burton.

## VII.

Because of the view we take, it is not necessary to meet appellants' other arguments except the amount of the December 18, 1981 attorney's fees award. *See* Brief for Appellants at 39.

A court may, in its discretion, award attorney's fees to a prevailing party in a suit brought under 42 U.S.C. § 1983. 42 U.S.C. § 1988. After carefully evaluating the legal services performed for Burton by his counsel, the district court awarded his counsel attorney's fees in the amount of $8,200.00. Since we have now reversed the award of compensatory damages, Burton is no longer the prevailing party in this aspect of his case. We must therefore determine whether the award of attorney's fees was proper.

Burton prevailed in his quest for injunctive relief. Nothing in our decision today affects the equitable relief granted; as stated previously, appellants did not appeal that portion of the district court's award. Thus we are confronted with a situation in which a plaintiff has prevailed in only a portion of his § 1983 case.

In *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court addressed a similar situation and articulated the standard for courts to apply in awarding attorney's fees under 42 U.S.C. § 1988 to a partially successful plaintiff. The Court stated:

We hold that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. *But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.*

*Id.* at 440, 103 S.Ct at 1943 (emphasis added).

We are not satisfied that Burton's claims for injunctive relief and damages are sufficiently related to preclude the apportionment of attorney's fees. The district court awarded preliminary injunctive relief in August 1978. From that date forward, Burton's attorney directed his efforts at securing a damages award. The bench trial that adjudicated Burton's damages claims did not commence until August 1980, two years after the injunctive relief was granted.

 

Furthermore, we believe that Burton "achieved only limited success" and therefore an attorney's fees award should be "reasonable in relation to the results obtained." *See id.* at 440, 103 S.Ct. at 1943. In this regard we note that Burton's underlying legal contention that appellants violated his right to due process—a contention relied upon to support his prayer for both equitable relief and damages—has today been rejected by this court. It thereby follows that the district court's initial award of injunctive relief can at best be characterized as "limited success," and accordingly we hold that the attorney's fees award should be apportioned.[7]

Under ordinary circumstances, we would remand these proceedings to the district court to make a proper apportionment between that part of the $8,200 fee attributable to the successful prayer for relief. Remand to the district court in the first instance is the general rule which we have meticulously followed in the past and intend to follow vigorously in the future. But we find here an overarching consideration—the conservation of judicial resources—that compels us to invoke the narrowest of exceptions to our normal procedures. This case has persisted for over ten years in this court system, commanding the attention of three separate district judges, three separate panels of this court, and in one instance, the court *in banc.* We decide that it is now time to close this case.

Accordingly, we have decided the question of attorney's fees and, upon our review of the record, we have allocated fifty percent of the original award of $8,200.00 for Burton's successful prosecution of his injunctive relief claim and deny the other fifty percent.

## VIII.

The judgment of the district court of November 22, 1983 which affirmed the judgment entered November 5, 1980 awarding Frederick Burton damages in the sum of $6,700.00 will be reversed. The cause will be remanded to the district court with a direction to enter judgment for appellants on Burton's claim for compensatory damages. The order of November 30, 1983 which affirmed the order of December 18, 1981 awarding the sum of $8,200.00 as attorney's fees to Paul R. Gettleman, Esq. shall be vacated with a direction to award him attorney's fees in the amount of $4,100.00.

Each side to bear its own costs.

---

7. The *Hensley* Court stated: "[A] plaintiff who failed to recover damages but obtained injunctive relief, or vice versa, may recover a fee award based on all hours reasonably expended if the relief obtained justified that expenditure of attorney time." *Id.* at 435 n. 11, 103 S.Ct. at 1940 n. 11. We conclude in light of our previous discussion that the injunctive relief obtained in August 1978 does not justify compensation of Burton's attorney under 42 U.S.C. § 1988 for Burton's unsuccessful damages claim.