**Juan PEREZ, et al., Plaintiffs,**

v.

**Calvin NEUBERT, et al., Defendants.**

**Civ. A. No. 85–2702.**

**(Consolidated with Civ. A. No. 85–2703 through 85–2734).**

United States District Court,
D. New Jersey.

June 20, 1985.

Juan Perez, et al., pro se.

Irwin I. Rimmelman, Atty. Gen. of N.J. by Stephen P. Tasy, Deputy Atty. Gen., Trenton, N.J., attorneys for defendants.

OPINION

GERRY, District Judge.

I. INTRODUCTION

These are thirty-three consolidated cases. The plaintiffs are among some 125,000 Cubans who arrived in the United States in the spring and summer of 1980, as part of the "Freedom Flotilla" that embarked from the Port of Mariel, Cuba. *See Fernandez-Roque v. Smith*, 734 F.2d 576 (11th Cir. 1984). Of these 125,000, a small percentage, but a fairly substantial number, were inmates released from Cuban jails and mental institutions. This court has no certain information about which, if any, of the thirty-three plaintiffs involved in these cases fall into this latter category of "Marielitos."

Because most of these 125,000 Marielitos lacked documents entitling them to legally enter the United States, they were deemed "excludable." *See* 8 U.S.C. § 1182(a). Normally, excludable aliens, following exclusion hearings, are immediately deported, "unless the Attorney General, in an individual case, in his discretion, concludes that deportation is not practicable or proper." 8 U.S.C. § 1227(a). In the case of the Mariel Cubans, due to the special circumstances of their arrival, the Attorney General deemed deportation improper. Pursuant to his authority under 8 U.S.C. § 1182(d)(5), the Attorney General "paroled into the United States" the majority of the Marielitos, including the thirty-three presently before the court. Since arriving in Florida, the plaintiffs have come to New Jersey. All have been convicted of crimes committed in New Jersey and are serving sentences in connection with those crimes.

These convictions *may*, at some future date, result in the return of the plaintiffs to Cuba. As of the summer of 1984, the government of Cuba had refused to accept back any of the Marielitos. In late 1984, the governments of the United States and Cuba reached some kind of an understanding under which Cuba would take back some of the Marielitos the United States government considered undesirable. However, in May 1985, the United States began broadcasts to Cuba via Radio Martí. This station, which bears the name of a Cuban national hero, was charged with the responsibility of transmitting anti-Castro information into Cuba. The Cuban govern-

ment, apparently incensed by the broadcasts, abruptly backed out of its agreement to repatriate the Marielitos. While it is conceivable that at some point the governments may reach a new understanding under which deportation could be resumed, at the moment that is mere speculation.

On or about April 3, 1985, the thirty-three plaintiffs were removed from the general prison populations of several state correctional institutions and were transferred to the Management Control Unit (MCU) at the Leesburg State Prison. The MCU, as will be described hereinafter, is a more restrictive form of confinement than general population confinement.

The plaintiffs have brought suit pursuant to 42 U.S.C. § 1983 and claim violations of the 1st, 4th, 6th, 8th and 14th Amendments. They seek by way of injunctive relief their return to the general prison population. A hearing on their preliminary injunction application was held on June 7, 1985. In addition to the testimony and documents put into evidence on that day, the defendants have submitted for the court's *in camera* inspection additional evidence regarding the need for special confinement.

The following shall constitute the court's findings of fact. and conclusions of law.

## II. FINDINGS OF FACT

1. All thirty-three plaintiffs have been convicted of crimes in the State of New Jersey and are currently incarcerated in the Management Control Unit in Leesburg State Prison. Prior to being placed in the MCU on or about April 3, 1985, the plaintiffs were serving their sentences in various institutions in the New Jersey system. Fifteen were in the general prison population at Leesburg (Brito, F.; Brito, R.; Contrera; Dixon; Echeverria; Jiminez; Morales; Moreno; Musa; Navarro; Ortiz;

Puente; Ramirez; Sanchez; and Valdez); five were in the general population at Southern State (Junquera; Lopez, A.; Miquez; Rivera; and Velasquez); three in the general population at Annandale (Mendez; Roman; and Salabria); one was in the Youth Corrections facility at Yardville (Gonzalez); and nine were in the Prisoner Reception Unit (PRU) at Yardville (Delarosa; Fuentes; Garcia; Illarza; Lopez, P.; Niebla; Perez; Rosell; and Verdecia). The PRU seems to be a temporary way-station for those admitted to confinement in the state system. After being examined and classified, inmates are ordinarily transferred from the PRU to other facilities. None of the plaintiffs came from the state prisons at Trenton or Rahway.

2. The court does not have before it complete information on the crimes for which the plaintiffs were convicted. We do know the parole eligibility dates of these men, however. Thirteen are eligible in 1985; eight, in 1986; five, in 1987; three, in 1988; two, in 1990; and one, in 1991. (Information as to one man, Valdez, was uncertain.) [1]

3. The defendants in these actions are Irwin I. Kimmelman, the Attorney General for the State of New Jersey, and E. Calvin Neubert, the Superintendent of Leesburg.

4. The plaintiffs were not the only Marielitos in the New Jersey prison system who were placed in Management Control Units throughout the state. In fact, *all* of the approximately 170 Mariel Cubans in the system were so placed in early April 1985, in MCUs at Trenton, Rahway and Leesburg. Non-Mariel Cubans were not similarly singled out for such treatment, nor were other conspicuous groups within the prisons, such as "bikers" or Muslims.

5. The system-wide segregation of Mariel Cubans was precipitated by revelations concerning a series of incidents and threatened demonstrations involving some of the

---

[1] One's parole eligibility date is not necessarily the equivalent of the date one will be released. The Parole Board has the discretion to deny parole for a variety of reasons. Moreover, even if one is paroled, one will not necessarily be set free. If there is an outstanding detainer, one will be released into the custody of the authority which has lodged the detainer. It appears that the Immigration and Naturalization Service (INS) has detainers on twenty-eight of these plaintiffs.

Marielitos in several of the prisons. Out of deference to the interest of prison officials in keeping the sources of this information—some of it from confidential informants—secret, the court will only set forth below so much detail as is necessary to give its decision coherence.

(a) In July 1984, there was a group demonstration at Leesburg staged by fourteen Marielitos, apparently resulting in some way from these inmates' dissatisfaction with their Immigration and Naturalization Service (INS) detainers. These inmates merely threatened a hunger strike and a work stoppage until their concerns were addressed but did not threaten violence. Some of the demonstrators were transferred. Notably, not all Marielitos at Leesburg were involved in the demonstration, and no action was taken against those not involved.

(b) In late February 1985, prison officials received a report from the INS based on information provided by an informant the INS characterized as reliable. The report stated that Mariel Cuban inmates were planning acts of violence against prison officials. The informant opined that these inmates would rather spend their lives in United States jails (by committing new acts of violence) than go back to Cuban jails pursuant to the deportation agreement between the two governments.

(c) An undated report of an Internal Affairs Unit (IAU) investigator (probably written shortly after the INS memo) identified the probable leaders at Trenton State and Leesburg of any coordinated activity by the Mariel Cubans.

(d) On March 31, 1985, officials received reliable, confidential information regarding a planned disturbance at Trenton State Prison the following day. This disturbance was to take place in the mess hall and ostensibly was supposed to be a protest against a new lunchroom procedure. But this protest, according to the informants, was merely a subterfuge. The Marielitos were actually planning acts of violence against prison personnel in order to avoid deportation. The informants believed that the Marielitos were to be joined in this demonstration by bikers and Muslims at Trenton State Prison, who would use the crisis as a means for airing their own, unrelated grievances.

6. Based on the reports from Trenton State Prison, all Marielitos at that facility were quickly placed in MCU lockup at Trenton State Prison on April 1.

7. After April 1, reports continued to come in.

(a) On April 3, 1985, there was an incident at Leesburg in which one Marielito stabbed another. Apparently, the victim had accused the attacker of being an informant (a "rat"), and the attacker believed that the victim was trying to turn other Marielitos against him. Although this stabbing upon later investigation seemed to have simply been an isolated incident involving two inmates, at the time it gave officials some cause for believing that it had something to do with the other Marielito unrest throughout the state.[2]

(b) Meanwhile, there was considerable unrest at Southern State. On April 2, the institution received inmates from Trenton State Prison. One of these transferees started a rumor that Marielitos at Trenton State Prison and Leesburg were being locked up and would be shipped to Cuba, where they would be shot. (We note for the record that there is no credible evidence from which to conclude that such a fate awaits any Marielitos who may ultimately be returned to Cuba. The now-abrogated repatriation agreement between the two governments contemplated that deportees would not be mistreated upon their return.)

In the early afternoon of April 4, 1985, personnel at Southern State received a report that Mariel Cubans at the facility had planned a disturbance the previous day, but

---

**2.** Ultimately, the attacker was judged guilty of disciplinary infractions, and his case was turned over to the county prosecutor for further action.

The victim was judged not guilty of disciplinary infractions.

that it had not materialized due to the inability of inmates to spread the word.

8. On April 3, 1985, all Marielitos at Leesburg were placed in MCU status there. Late on April 4, 1985, all Marielitos at Southern State were placed in MCU status there. It appears that on April 4, all other Marielitos in the state system were similarly placed. In the week or so that followed, various of these inmates were transferred around the state, so that at the present all are in MCUs in Trenton, Rahway or Leesburg.

9. Throughout early-to-mid-April, 1985, reports sporadically came in about further possible disturbances by the Mariel Cuban inmates at Trenton State, and information was received about a planned violent demonstration at Rahway which had been short-circuited by the segregation of Marielitos there.

10. There does not seem to have come to light during this period any specific information about planned violence by Marielitos at any of the following institutions: Bordentown, Mid-State, Annandale or Yardville (PRU and Youth Corrections).

11. The plaintiffs were placed in MCUs on April 3 or 4, pursuant to Department of Corrections Standard 141.

According to the testimony of prison officials and the terms of Standard 141, confinement in the Management Control Unit is not disciplinary or "punitive"; that is, confinement is not imposed because an inmate has violated a prison regulation. Confinement is not viewed as a stain on one's prison record and is not considered in any way in the parole process. Rather, the Management Control Unit is a form of preventive detention used by officials to prevent a potential disturbance from erupting. In the language of the Standard, an inmate may be placed in the MCU if he constitutes a "threat":

(1) to the safety of others; or (2) of damage to or destruction of property; or (3) of interrupting the safe, secure, and orderly operation of the institution....

Ordinarily, a hearing precedes placement in the MCU. However, under the Standard, one may be placed in the MCU prior to hearing in the event of an emergency posing an immediate and substantial threat to the security and orderly operation of the institution. In the event of an emergency, hearings are to be held "as soon as possible," with the promptness depending on the number of inmates involved. And any inmate who is continued in the MCU following a hearing is entitled to a review of the need for continued confinement at least once every three months. *See* Standard 141.10 and .11.

12. On April 3, each of the plaintiffs in the Leesburg general population was notified that he was being placed in the MCU. The notice made mention of each plaintiff's status as an "illegal Cuban alien," and further stated:

The intent of this action is to halt untoward escalation of activities which in our best professional judgment could pose a serious threat to the well-being and safety of the staff and inmate population.

13. On April 23 or 24, each plaintiff in these cases was given a notice of an MCU classification hearing to be held on April 25 or 26. The notice listed the factors which, "in general," the Special Classification Committee would be considering:

Past record including offense(s) for which committed; records of past institutionalization; disciplinary record on work assignments; adjustment to institutional programs, records on past housing assignments; attitude toward authority; psychological makeup; and involvement in criminal activities within the prison.

These factors are those listed in Standard 141 itself.

14. Prison officials testified that hearings could not be held until three weeks after placement in the MCU because of the large number of inmates involved. Prior to this wholesale segregation, there had only been some 22 individuals in MCU status.

15. Hearings were held as scheduled. Each plaintiff was given an opportunity to

make a statement, and each plaintiff denied any intention to participate in any organized protests or violence. It appears that the inmates were told about the Trenton State situation (apparently the most dangerous). Some inmates stated that they had nothing to do with the problems at Trenton State Prison. At the hearings, the prison officials verified that the plaintiffs were Marielitos.

16. On May 2, 1985, each plaintiff was given a Notice of Classification Decision. The thirty-three Notices are identical, and each reads as follows:

> All Cuban (Marielito) aliens that are incarcerated within the state prisons are presently subject to deportation back to Cuba. Confidential information received by the Department of Corrections indicates the obsessive fear of deportation in effect initiated a conspiracy to create [a] violent, hostile disturbance. You have been identified as a Mariel Cuban subject to be deported. Although you have not posed a problem to date, your relationship with and/or possible peer pressure from other Mariel Cuban conspirators may result in your becoming involved in an institutional disturbance of serious consequences. You pose a threat to the security and orderly operation of any correctional institution while incarcerated. It is the decision of the Special Classification Committee that you be placed in a Management Control Unit where you can participate in work/education programs without endangering the lives of others, including staff and inmates.

The notice further alerted plaintiffs of their right to take an appeal to defendant Neubert and notified them that their cases would be reviewed in August, 1985.

17. Some of the plaintiffs did take an administrative appeal. All such appeals were resolved on May 24, 1985 in favor of the original decision.

18. As of this writing, all thirty-three plaintiffs remain in the MCU at Leesburg.

---

**3.** This is not a significant restriction in the case of these plaintiffs, none of whom speak much

While Standard 141 indicates that MCU inmates have many of the same privileges and rights available to inmates in the general population, it is readily apparent that these privileges and rights are definitely subject to significant restrictions, which might lead the MCU inmates to doubt that they are not being "punished."

For example, MCU inmates must eat in their cells.

They may work, but their work is performed in their cells. Each plaintiff has been assigned the job of "cell sanitation"—keeping his cell clean. Prior to MCU assignment, the plaintiffs performed a broader range of work activities.

Exercise and showers are limited.

MCU inmates do not attend religious services, although "spiritual counseling shall be available on an individual basis." *See* Standard 141.24.

Access to the prison law library is only indirectly available, through intermediaries.[3]

Educational activities are also available but, again, apparently on an individual basis within each inmate's cell.

In short, then, the plaintiffs are locked up, one to a cell, twenty-four hours a day, with certain brief periods outside their cell.

### III. LEGAL ANALYSIS

1. Before we begin, we emphasize that this case is concerned only with thirty-three Marielitos at Leesburg prison. While there may be similarities between the circumstances of these men and those affecting other Marielitos throughout the state correctional system, differences of which this court is not fully aware may warrant that those confined in MCUs at Trenton State Prison and Rahway Prison be treated differently.

2. Additionally, we note that the defendants, to their credit, have not contended that the plaintiffs, because they are

English.

excludable aliens, are not in the present context protected by the Constitution. It has recently been held that excludable aliens cannot challenge either INS admission or parole decisions under a claim of constitutional right. *Jean v. Nelson,* 727 F.2d 957, 972 (11th Cir.1984) (*en banc*). However, excludable aliens may be able to challenge, under a constitutional theory, governmental action *outside of* the immigration context. *See Fernandez-Roque v. Smith,* 734 F.2d at 582 n. 8; *U.S. v. Henry,* 604 F.2d 908, 914 (5th Cir.1979) (*Miranda* rights); *Medina v. O'Neill,* 589 F.Supp. 1028 (S.D.Texas 1984) (conditions of confinement). While the issue may not be free from doubt, we will proceed on the assumption that the plaintiffs may challenge their confinement on constitutional grounds.

■ 3. If we had found that the conditions of confinement of the plaintiffs were substantially similar to those affecting inmates in the general population, we would be proceeding no further. Mere sequestration, under "separate but equal" conditions, would not, in the prison context, be cognizable under § 1983. However, in our factual findings, we concluded that the conditions of confinement in the MCU are substantially less favorable than the conditions suffered by the general population. We would not go so far, however, as to characterize the MCU conditions as so "cruel and unusual" as to be violative of the Eighth Amendment.

4. New Jersey, like other jurisdictions, has adopted regulations establishing two basic types of restricted housing—disciplinary and administrative segregation.[4]

Confinement in disciplinary segregation is punitive and is imposed when an inmate has violated a prison rule. Administrative segregation—MCU confinement—is not imposed as punishment but is used to head off a *potentially* dangerous situation within the prison. We assume, nevertheless, that the actual conditions of these two types of confinement are about the same.

The leading case on administrative confinement is *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), wherein the Supreme Court considered "what limits the Due Process Clause of the Fourteenth Amendment places on the authority of prison administrators to remove inmates from the general prison population and confine them to a less desirable regimen for administrative reasons." *Id.* at 462, 103 S.Ct. at 867.

The Supreme Court rejected the claim that the Due Process Clause implicitly, in and of itself, created a liberty interest in being confined to the general population, rather than to more austere conditions:

It is plain that the transfer of an inmate to less amenable and more restrictive quarters for non-punitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence [and does not involve] an interest independently protected by the Due Process Clause.

*Id.* at 468, 103 S.Ct. at 869–70. But, the Court went on to recognize, a liberty interest protected by the Due Process Clause may be created by state statute or regulations. *Id.* at 468, 103 S.Ct. at 869.

While both the Third Circuit and the Supreme Court in the *Hewitt* case were somewhat reluctant to read the Pennsylvania regulations there at issue as creating a liberty interest in confinement in the general population,[5] both courts nevertheless did

---

**4.** The terminology the New Jersey system uses to describe these types of confinement is at variance with the terminology more commonly encountered in the case law. New Jersey refers to disciplinary confinement as "administrative segregation," and refers to administrative confinement as "placement in the Management Control Unit." To avoid confusion, we will employ the more common terminology.

**5.** The Third Circuit observed:

Such a right may be less easily recognized in the context of administrative confinement ... even though the conditions of administrative confinement are not substantially different from those experienced in disciplinary confinement. This reluctance [to recognize the right] stems from observation that administrative confinement is often used to maintain control in a volatile environment—to quench sparks before they become flames.

hold that the Pennsylvania regulations created such a liberty interest in non-restrictive confinement. These courts were persuaded that the regulations, by setting forth substantive grounds justifying administrative confinement, clearly contemplated that an inmate would not be confined "absent [these] specified substantive predicates." 459 U.S. at 472, 103 S.Ct. at 871.

■ This court has carefully considered New Jersey Department of Corrections Standard 141, and we conclude that this regulation similarly confers a liberty interest in general population confinement. This conclusion is implicit in the regulation's setting forth of grounds permitting administrative confinement:

> [That an inmate constitutes a] threat (1) to the safety of others; or (2) of damage to or destruction of property, or (3) of interrupting the safe, secure and orderly operation of the institution....

An inmate who does not pose such a threat is therefore entitled to remain in the general population.

5. Having determined that the plaintiffs have a liberty interest protected by the Due Process Clause, it becomes necessary to determine *what kind* of process is required (i.e., the nature of the hearing) before that interest can be taken away, and *when* the process is due.

Again, *Hewitt v. Helms* provides us with a starting point for analysis. There, the Supreme Court held that one may be placed in administrative confinement prior to a hearing, and that the hearing need only be held "within a reasonable time after" confinement. *Id.* at 472, 103 S.Ct. at 872. Cases in this District which predate *Hewitt* have likewise held that exigent circumstances within a prison may warrant segregation without prior notice and hearing. *Calloway v. Fauver*, 544 F.Supp. 584, 601 (D.N.J.1982); *Hodges v. Klein*, 421 F.Supp.

1224, 1231 (D.N.J.1976), *aff'd*, 562 F.2d 276 (3d Cir.1977).

■ Accordingly, we conclude that due process was not violated by the initial, pre-hearing placement of the plaintiffs in MCUs on April 3 and 4. Based on the reliable information and less substantiated rumors coming in, this court cannot conclude that the official response was exaggerated.

■ Next, we address the question of whether the hearings were held "within a reasonable time" after confinement. Insofar as the plaintiffs do not seek damages, this is something of a moot point. The fact is, hearings were held. The *outcomes* of the hearings are plaintiff's principal grievance. Nevertheless, for the sake of not leaving unanswered questions that might just as easily be answered, we hold that the hearings were held with reasonable expedition. In deciding what is reasonable, we consider the time necessary for completion of an investigation of the potentially dangerous circumstances and the principal role-players, as well as the administrative burden the hearings entailed. We note that officials were still garnering information on possible disturbances in mid-April, and that the number of hearings was quite substantial (approximately 170). Given these factors, we cannot conclude that the three week delay between initial confinement and the hearings was unreasonably long, or that the additional week it took for prison officials to reach their decisions was unreasonably long.

*Hewitt v. Helms* further dictates the conclusion that the *type* of hearings held passed (indeed, surpassed) constitutional muster. The Supreme Court there held:

> [A]n informal, non-adversary evidentiary review is sufficient ... for the decision that an inmate represents a security threat.... An inmate must merely receive some notice of the charges against him and an opportunity to present his

---

*Helms v. Hewitt*, 655 F.2d 487 at 494 (3rd Cir. 1981). The Supreme Court further observed that prison officials, entrusted with the day-to-day operation of a prison, should perhaps be

afforded more latitude than prison regulations may appear to contemplate. 459 U.S. at 470, 103 S.Ct. at 870.

views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily, a written statement by the inmate will accomplish this purpose.... So long as this occurs, and the decision maker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Id.,* 459 U.S. at 476, 103 S.Ct. at 874. Thus, the Court eschewed the more formal, elaborate, procedural requirements appropriate to disciplinary confinement cases. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

█ In the instant case, the plaintiffs were informed of the problem forming the basis for the possible continuation of confinement and were given an opportunity to tell their side of the story. Accordingly, as far as form or procedure was concerned, the classification hearings were more than adequate.

6. That brings us to the question which presents some difficulty: whether the decision of the Classification Committee to continue the MCU status of the plaintiffs was justified. This is not a matter of procedure, but one of substance.

█ We start with the maxim that "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). The safety of the institution's inmates and guards is perhaps the most fundamental responsibility of the prison administration. *Id.; Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977). Nevertheless, the court need not defer to prison officials where there is substantial evidence in the record to indicate that the official response is "exaggerated." *Bell, supra,* 441 U.S. at 547–48, 99 S.Ct. at 1878–79; *Calloway, supra,* at 598.

█ Second, as to a hearing officer's factual findings, it is not for a court to weigh the evidence *de novo* and draw its own conclusions. Rather, the court's function is limited to determining if the hearing officer's conclusion is supported by substantial evidence. *Id.* at 605. Put another way, we merely ask whether or not the Classification Committee decision was "arbitrary and capricious," whether or not there were "some facts" to support the decision. *McCrae v. Hankins,* 720 F.2d 863, 868 (5th Cir.1983); *Smith v. Rabalais,* 659 F.2d 539, 545 (5th Cir.1981).

Even when we accord the defendants this wide-ranging deference, we are greatly troubled by the wholesale treatment of the plaintiffs. Each inmate, although individually examined by the Committee, got a Notice of Decision identical in all respects to the Notice received by his co-plaintiffs. *See* Finding of Fact 16, *supra.* The defendants' witnesses conceded that the only real criterion for continued confinement was whether the inmate was a Marielito. Essentially, then, we have a case of "guilt by association."

█ We are fully aware that in considering a particular inmate's potential for threatening institutional security, prison officials may attach some significance to group membership and may consider a broad range of factors somewhat extrinsic to the particular individual. As dicta in *Hewitt v. Helms* indicates:

In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead they must consider the character of the inmates confined in the institution, recent and long-standing relations between prisoners and guards, prisoners *inter se,* and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other[s] ... even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous inci-

dents.... [T]he administrators must predict not just one inmate's future actions ... but those of an entire institution. 459 U.S. at 474, 103 S.Ct. at 873. *See also Mims v. Shapp,* 744 F.2d 946 (3d Cir.1984).

Nevertheless, that cannot excuse, in our opinion, the total disregard of individual factors that these cases seem to represent. One would think that the latitude afforded prison officials to effectuate pre-hearing MCU confinements and to defer hearings for a reasonable period carries with it the obligation to more fully investigate *"pendente lite"* each inmate's risk to the institution. Accordingly, we must conclude that the decisions of the Classification Committee are not supported by substantial evidence.

▪ 7. That brings us to the question of remedy. As this is an injunctive application, we must, *inter alia,* consider the public interest, which in this case we believe is virtually synonymous with prison safety. Although we do not believe the prison officials gave sufficient consideration to individual factors, we certainly cannot conclude that, if such factors *had* been considered, the results would have been different. The evidence submitted *in camera* certainly suggests that at least some of the Marielitos pose a grave threat to prison security. Therefore, we believe it would be a mistake for us to ignore the quite legitimate fears of the defendants and return—wholesale—the plaintiffs to the general population. Rather, we believe that what is called for is a new round of hearings, to be held expeditiously.

*Hewitt v. Helms* recognizes that administrative segregation may not be used as a pretext for indefinite confinement, and that prison officials must engage in some sort of a periodic review of administrative confinement. 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9. Such further review is especially warranted here where: the initial review was somewhat flawed; where Standard 141 itself contemplates such review (every three months) anyway; and where the defendants' witnesses recognized that the deportation status of the plaintiffs is different from what it was as of the original hearings. *See* Introduction, *supra.* As the Third Circuit has recently observed, "The validity of the government's interest in prison safety and security as a basis for restricting the liberty rights of an inmate subsists only as long as the inmate continues to pose a safety or security risk." *Mims v. Shapp,* 744 F.2d at 953. Presumably, the present non-deportability of the plaintiffs alters the equation somewhat.

The Third Circuit further acknowledged that while an inmate's interest in non-administrative confinement is "not one of great consequence," *id.* at 950, *quoting Hewitt,* that interest becomes more significant as its duration becomes longer or more indefinite. *Id.* at 951–52.

▪ Accordingly, we will require rehearing in all thirty-three cases within 30 days of this opinion. In considering each plaintiff's risk to institutional security, the defendants are at liberty, as before, to take into account factors extrinsic to the individual, such as group membership and the institutional atmosphere. The Third Circuit, in *Mims, supra,* pointed out that officials are free to consider such "subjective" factors. *Id.* at 953. But that does not mean that other factors equally relevant should be overlooked.

In the second set of hearings, the defendants should also consider the following, we believe, in an effort to reach as broadly based a decision as possible:

(a) Whether the particular inmate has an outstanding INS detainer.

The evidence suggests that not all the plaintiffs have detainers. To the extent that an inmate is not subject to a detainer, he may have less reason to be restive about his immediate future.

(b) How much time each plaintiff has left to serve.

One might think that to the extent one has a lengthy term ahead, which might have to be served *prior to* deportation, one would be less desperate to act.

(c) What prison each plaintiff came from.

Most of the plaintiffs seem to come from medium to minimum security facilities. Not only may those inmates, having been so assigned, be presumed to pose less of a risk; also, such prisons may have lacked the sort of inmate group action more commonly associated with Trenton State Prison and Rahway Prison and most dangerous to security.

    (d) What each inmate actually thinks about:

    (1) when and/or whether he will be having an exclusion hearing;

    (2) what the outcome of that hearing would probably be; and

    (3) what will happen if he is sent back to Cuba.

Although officials may have facts and opinions about these matters which differ from those of the inmates, inmate perceptions may well be probative as to their potential for violent action. Of course, officials shall be the judges of credibility.

In addition to the above, the prison should consider the criteria set forth in Standard 141.5: past criminal record, disciplinary record within the prison, institutional adjustment, etc. *See* Finding of Fact 13. The officials should also pay greater attention to the intelligence gathered, vis-a-vis each individual.

In summary, then, we hold that due process requires a new set of hearings in accordance with the above criteria.

8. We shall retain jurisdiction over this matter, and the defendants shall apprise us of the progress and outcome of these hearings.

9. The plaintiffs' claims on constitutional grounds other than the due process clause shall be dismissed.