**Armando VALLINA, Plaintiff,**

v.

**Edwin MEESE, III, Attorney General of the United States, John Gluch, Warden, Milan Federal Correctional Institute, J. Michael Quinlan, Director of the U.S. Bureau of Prisons, George Wilkinson, Director of the Kansas City Regional Office of the U.S. Bureau of Prisons, John Doe, an employee of the Kansas City Regional Office of the U.S. Bureau of Prisons, all individually and in their official capacities, jointly and severally, and the United States Bureau of Prisons, Defendants.**

No. 87–74316.

United States District Court, E.D. Michigan, S.D.

Jan. 20, 1989.

Robert Fair Gillett, Legal Services of Southeast Michigan, Douglas R. Mullkoff, Ann Arbor, Mich., for plaintiff.

Peter A. Caplan, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

The Plaintiff, Armando Vallina, is currently confined at the Milan Federal Correctional Institution (F.C.I.–Milan) in Milan, Michigan. He brought this action claiming that his removal from the general prison population into administrative detention from November 23, 1987 through December 2, 1987, violated his rights to equal protection and due process under the United States Constitution.

The case is now before this Court on Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). This memorandum constitutes the findings of fact and conclusions of law upon which the Court bases its grant of summary judgment for the Defendants.

STATEMENT OF FACTS

The factual setting for this action followed in the wake of an agreement between the governments of the United States and Cuba which was announced in the latter part of November, 1987 and concerned the return to Cuba of certain Cubans who were confined at that time in American prisons. On November 21, 1987, in response to news of that announcement, an inmate riot broke out at the Federal Correctional Institution in Oakdale, Louisiana. Although the rioters were primarily Cuban inmates who had arrived in the United States from Cuba as part of the 1980

Mariel boat lift (and were therefore known as "Marielitos"),[1] it was not clear at that time whether the agreement pertained to Marielitos only, or to all imprisoned Cubans facing possible deportation from this country.

The following day, November 22, 1987, a bus from F.C.I.–Milan was required to be sent to Oakdale to transport prisoners for housing at the F.C.I.–Milan facility because the Oakdale facility had been substantially destroyed. In preparation for this inmate transfer from the beseiged Oakdale facility, John Gluch, warden of F.C.I.–Milan, and a named defendant in this action, instructed his staff to identify all of the Cuban inmates already present in his facility and facing review by the Immigration and Naturalization Service (I.N.S.) for possible deportation. The Plaintiff was a member of this class.[2]

On the morning of November 23, 1987, another riot involving Cuban inmates erupted at another federal correctional facility in Atlanta, Georgia. On news of that event, Warden Gluch placed all Cuban inmates at F.C.I.–Milan who were facing I.N.S. deportation action, including Plaintiff, into administrative detention on that same date. Although the Warden was in contact with United States Bureau of Prisons officials concerning these events, the decision to segregate these prisoners was undisputedly solely his own. Because the Plaintiff was a Cuban national subject to possible deportation as a consequence of the detainer in his file, he was identified as a member of this group and placed into administrative detention. The warden's action was based on his knowledge of the volatile conditions prevailing among potentially deportable Cubans at the Oakdale and Atlanta facilities. At this point, he was aware that at least one facility had

been severely burned, 128 persons were being held hostage and at least one death had occurred.

Inmates housed in the general population at F.C.I.–Milan are permitted out of their cells to attend classes or use recreational facilities. Those in administrative detention, however, are usually accorded a lesser degree of liberty. The prisoners placed in administrative detention at Milan as a result of the rioting in Oakdale and Atlanta, however, were extended privileges not customarily granted to those of such status. They were not restricted to their cells 23 hours per day, they were provided with televisions, and they enjoyed greater contact among themselves than was standard procedure. Warden Gluch considered any Cuban facing I.N.S. deportation "to be an extreme threat or a potential threat to the security and safety of the institution."

As required by prison regulations, the Plaintiff was informed that he was being removed from the general population pending the outcome of a possible transfer to another facility. Also, in-person reviews were conducted by prison officials subsequent to his reclassification. These reviews, conducted on November 25, 1987 and December 2, 1987, were designed to ensure that Plaintiff and those similarly situated received proper medical attention, adequate exercise and that their general needs were being met.

At no time prior to this occasion had the Plaintiff been considered a threat to institutional security. While he was segregated in administrative detention there was adequate time to review his file. It was determined, after this review, that Plaintiff did not pose a threat to security and he was released from administrative detention on December 2, 1987, even though the uprising in Atlanta was still in progress.

---

1. "Marielitos" is the term used to describe the approximately 125,000 Cubans, a substantial number of whom were inmates released from Cuban jails and mental institutions, who came to the United States illegally in 1980 as part of the "Freedom Flotilla" which embarked from the Port of Mariel, Cuba. *See, Fernandez–Roque v. Smith,* 734 F.2d 576 (11th Cir.1984).

2. Plaintiff is a non-Marielito Cuban national who has a detainer placed in his file by the I.N.S. The detainer serves as notice to prison officials that the prisoner is under investigation to determine whether he is subject to deportation. The I.N.S. must be advised at least 30 days prior to the prisoner's scheduled release date, but the detainer does not affect prison officials' discretion in classifying inmates.

## DISCUSSION

■ The Plaintiff first claims that his reclassification into administrative detention was based solely upon his alienage, and was therefore constitutionally impermissible. Plaintiff argues that his reclassification must be analyzed under a strict scrutiny test and that under this test, Defendants' actions cannot stand. *Nyquist v. Mauclet*, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed. 2d 63 (1977). The Court disagrees.

Although it is true that classifications based solely upon alienage are subject to strict scrutiny by a reviewing court, *United States v. Carolene Products Co.*, 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938), that is not the appropriate test in the instant case. In urging the Court to apply a strict scrutiny analysis, Plaintiff necessarily concludes that his reclassification was indeed alienage based. This conclusion is erroneous in light of all of the undisputedly attendant circumstances. The Court finds that Plaintiff's reclassification into administrative detention was based on his membership in a class of persons who faced potential deportation as a result of the agreement between the United States and Cuba. Importantly, this also was the same class of persons responsible for the extraordinary events then underway at two other federal correctional facilities.

It appears to the Court that the correct standard of review is that espoused by the Defendants, and announced in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Under *Turner*, a rational-basis test is used to evaluate the actions of prison officials in the administration of their facilities. Plaintiff's assertions notwithstanding, the strict scrutiny test does not readily lend itself to the prison context under the unique facts presented in this case. *Turner* accords prison officials a necessarily wider degree of latitude than other government actors might have, particularly when dealing with, as here, security issues. "Subjecting the day to day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems ..." *Id.*, 107 S.Ct. at 2261.

■ In the case at bar, Warden Gluch acted in a reasonable and constitutionally justifiable manner, considering the emergency situation with which he was confronted. At the time of his decision, two federal prisons were under seige by rioting inmates incited by the Marielitos and at least one person had been killed. Prisoners from the riot-destroyed prison were enroute to be housed at Milan. It was not necessary that the warden wait for a similar crisis at his facility. Under these circumstances, he acted prudently in taking preventative measures to avoid any such occurrence. It was reasonable to remove those prisoners facing possible deportation from the general population to stem the tide of violence and destruction flowing from prisoners similarly situated at other institutions.

Application of a strict scrutiny test under such circumstances would unduly burden prison officials with the specter of judicial hindsight and impinge upon their discretion in an area where the courts should defer to their expertise. *Turner*, supra. Moreover, it is undisputed that this action was not taken against all Cubans: only those who were also potentially deportable.

The Plaintiff next argues that his removal from the general population was unjustified as he was neither a Marielito nor an individual threat to the security of the institution. This view, however, fails to acknowledge the exigencies faced by the warden.

■ A prison warden has a responsibility to maintain order and safety in his facility. Accordingly, he is granted wide discretion in the implementation of policies which further these goals. When the action taken appears to be a rational response to a clear security problem and there is no evidence that the response is exaggerated, the court will not second guess a prison official. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The safety of an institution's inmates and guards is perhaps the most fundamental responsibility of the prison administration. *Id.*, see also, *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d

629 (1977). Although courts need not defer to prison officials where there is evidence in the record to indicate that the official response was exaggerated, *Bell, supra,* there is no such showing here.

There can be little doubt that the removal of all Cubans facing the possibility of deportation from the general prison population was a reasonable response to the threat of violence at F.C.I.–Milan. *Brown v. Johnson,* 743 F.2d 408 (6th Cir.1984). This is so regardless of Warden Gluch's understanding of the United States–Cuba agreement. He understood that prisoners, incited by Marielitos fearful of a return to Cuba, were rioting at two federal facilities and he did not want his prison to be the third. The events at Oakdale and Atlanta were unfolding rapidly and the warden did not have the luxury of time to apprise himself of all the parameters of the agreement. The Plaintiff's status as a Cuban national facing possible deportation was, given that Cubans similarly situated were wreaking havoc at two other facilities, enough to warrant his separation. The fact that the Plaintiff had no history of violence and would not himself be considered a threat under normal circumstances is irrelevant given the emergency situation presented in this case.

Warden Gluch had no reason to believe that the violence at Oakdale and Atlanta would not spread to Milan with equally destructive results. Indeed, a busload of Oakdale prisoners was en route to Milan at the time. The Court, therefore, concludes that Plaintiff's placement into administrative detention, when analyzed under the appropriate rational-basis test, did not violate his right to equal protection as guaranteed by the 14th Amendment.

■ The Plaintiff's second contention is that his placement into administrative detention was violative of his right to procedural due process. He asserts that the procedures governing administrative detention which are set out in 28 CFR § 541.22 give rise to a protected liberty interest and that Defendants' failure to comply with them resulted in a denial of due process. Under section 541.22, a prisoner may be deprived of his right to remain in the general population only if one of six findings set out in the regulation is made. In relevant part, the regulation states that a warden may place an inmate into administrative detention

> when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution *and* when the inmate
> (1) Is pending a hearing for a violation of Bureau regulations;
> (2) Is pending investigation of a violation of Bureau regulations;
> (3) Is pending investigation or trial for a criminal act;
> (4) Is pending transfer;
> (5) Requests admission to administrative detention for the inmate's own protection, or staff determines that admission to or continuation in administrative detention is necessary for the inmate's own protection (See § 541.23); or
> (6) Is terminating confinement in disciplinary segregation, and placement in general population is not prudent. The Segregation Review Official is to advise the inmate of this determination and the reasons for such action.

28 CFR 541.22(a) (emphasis in original). According to the Plaintiff, none of the six findings were made against him.

Assuming *arguendo,* that the regulation accords Plaintiff a measure of due process, *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), it is Defendants' contention that the regulation was substantially complied with in this case. On November 23, 1987, the first day of his detention, the Plaintiff was given a memorandum informing him that he was being reclassified pending a possible transfer to another facility. (Gluch. decl., Exh. B). A pending transfer is one of the six bases upon which administrative detention can be enforced.

Section 541.22(c) directs the warden to designate appropriate personnel to review the status of inmates housed in administrative detention. The Plaintiff urges the

Court to interpret this provision as requiring review of the propriety of the detention. The Court disagrees. A reasonable reading of the provision does not mandate that prison officials review the propriety of an inmate's detention, only that his mental and physical well-being be reviewed within three days of placement. This undisputedly was done by the Defendants. Interviews were conducted on November 25, 1987, by Cleo Ward and December 2, 1987, by John Gorine.

The regulation further requires that the prisoner present a security risk. The Plaintiff argues that because he had no personal history of violence, he was improperly removed from the general population. He asserts that the Defendants failed to take account of his individual circumstances when the decision to reclassify him was made. In support, the Plaintiff cites several cases including *Perez v. Neubert*, 611 F.Supp. 830 (D.C.N.J.1985).

Unlike the instant case, *Perez* dealt with the administrative detention of Marielitos based solely on their status as such. The district court held that the plaintiff's continued detention without due regard for his individual potential for threatening institutional security amounted to a deprivation of due process. The court likened this practice to "guilt by association." *Id.* at 839. Here, however, the facts reveal that the Plaintiff was indeed released subsequent to a thorough review of his file. There is no evidence in the record that Plaintiff's "continued" detention was without due regard for his individual propensity for violence or agitation.

The *Perez* court then went on to say that "in considering a particular inmate's potential for threatening institutional security, prison officials may attach some significance to group membership and may consider a broad range of factors somewhat extrinsic to the particular individual." *Id.* at 839. Here, Plaintiff's detention was not based solely on his status as a Cuban, but rather on the fact that Cuban prisoners facing the possibility of deportation were rioting at two federal facilities and that he was a member of that class. Certainly, the rioting in Oakdale and Atlanta, and the people involved, are extrinsic factors which fall within the broad range of factors that the warden could consider.

The Plaintiff's detention in this case must, as has been previously noted, be viewed in light of the prevailing emergency conditions. The warden took steps which, after full consideration of the known facts, he found in his discretion to be necessary and appropriate to minimize the possibility of violence erupting at his prison. Once this action was taken, Warden Gluch endeavored to ascertain the potential of each individual prisoner for disruption and violence. As a result, the Plaintiff was determined not to be a threat to security. It should also be noted that Plaintiff was released while the rioting in Atlanta was still in progress.

In light of the foregoing, the Court finds that the Plaintiff's rights to due process and equal protection, as provided for by the 5th and 14th Amendments, were not abridged in this case.

Finally, having found there to be no violation of Plaintiff's constitutional rights, it is unnecessary for the Court to reach Defendants' claim of qualified immunity. Now, therefore,

IT IS ORDERED that Defendants' motion for summary judgment be and hereby is GRANTED.

IT IS SO ORDERED.