Joseph **TOUSSAINT**, et al., Plaintiffs,

v.

James **ROWLAND**, et al., Defendants.

No. C–73–1422 SAW.

United States District Court,
N.D. California.

April 20, 1989.

Plaintiffs also have brought a motion to strike the Declaration of Louis Dentici[2], contending that because it was not submitted to the Monitor, it is an attempt by defendants to supplement the record with evidence that was not before the Monitor when he issued the Report.

Rosen & Phillips, Sanford Rosen, Susan Fiering, Bernard Zimmerman, Sarah Flanagan, Pillsbury, Madison & Sutro, San Francisco, Cal., Donald Specter, Steven Fama, Prison Law Office, San Quentin, Cal., Sidney Wolinsky, Berkeley, Cal., James Sturdevant, Sturdevant & Sturdevant, San Francisco, Cal., Antonia Hernandez, Denise Hulett, MALDEF, San Francisco, Cal., for plaintiffs.

Peter Siggins, Bruce Slavin, State Attorney General's Office, San Francisco, Cal., for defendants.

## MEMORANDUM AND ORDER

WEIGEL, District Judge.

On February 10, 1989, the Monitor filed the Third Special Report (Report), dealing with the due process issues remanded to this Court by the Court of Appeals, *see Toussaint v. McCarthy,* 801 F.2d 1080, 1114 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).[1] The Report responded to this Court's reference to the Monitor. *See* Order of July 2, 1987.

Plaintiffs request that the Court adopt the Report as the order of the Court, with two suggested modifications. Defendants have posed numerous objections and modifications.

### I.

Defendants have not responded to plaintiffs' motion to strike. The Order of Reference to the Monitor provided that the Court will "entertain no objections to any report unless it is shown as a preliminary matter that an *identical* objection was submitted to the Monitor in the form of a specific written objection in accordance with the preceding paragraph of this Order." *Toussaint,* 597 F.Supp. 1388, 1421 (N.D.Cal.1984) (emphasis added). Defendants posed the *objection,* in support of which the declaration is submitted, to the Monitor.[3] However, the *declaration* and the material it contains was not presented to the Monitor.

Defendants had an opportunity to submit the Dentici declaration to the Monitor, but failed to do so. The Court should not be put in the position of considering evidence that was not before the Monitor. Plaintiffs' motion to strike will be granted.

### II.

The Monitor was appointed as a Special Master under Federal Rule of Civil Procedure 53. His findings should be reversed only if clearly erroneous. Fed.R.Civ.P. 53(e)(2); *Toussaint,* 597 F.Supp. at 1413.

### A. Plaintiffs' Motion to Modify.

Plaintiffs request that the Court adopt the Report as the order of the Court with

---

1. Specifically, those issues concern the due process afforded prisoners placed in "administrative segregation". Administrative segregation (segregation) refers to the custody status of all prisoners who are confined in maximum security, minimum privilege security housing units for periods averaging 22 or more hours per day. *See Toussaint v. McCarthy,* 597 F.Supp. 1388, 1393 (N.D.Cal.1984).

2. This declaration concerns defendants use of polygraph examinations. Dentici states, *inter*

*alia,* that polygraph examinations "are an essential part of [defendants'] security measures", that "polygraph examinations are strictly voluntary", and that "[o]n no occasion is an inmate is [sic] ever forced to take a polygraph examination." Declaration of Louis Dentici at 2.

3. That objection is to the limitations in the Report placed on defendants' use of polygraph examinations.

two modifications: First, plaintiffs request that the Court modify the Report (¶ 94) by changing the period for the Court's continuing jurisdiction to review due process questions from *one* year to *two and a half* years. Second, plaintiffs request that the Report (¶ 74) be modified to require review of segregation decisions every 90 days instead of every 120 days.[4]

(1) The Court's Continuing Jurisdiction.

Plaintiffs urge that the period for the Court's continuing jurisdiction to review due process in this case should terminate when (1) the Court finds that due process violations have been eradicated for a period of two and a half years, rather than one year, and (2) there is no reasonable likelihood those violations will recur with regularity.

The Report states at ¶ 94:

94. Under the stimulus of an injunction from this Court, defendants ought to be able promptly to end the due process violations found herein. For this reason, and because it would be improper for the Court to exercise a permanent continuing jurisdiction, the Court's continuing jurisdiction to review due process in this case should terminate *in one year*, unless the Court should then find that due process violations are continuing to occur with regularity.

(Emphasis added).

Plaintiffs contend that a period of two and a half years of continuing jurisdiction by the Court is needed. They point out the

history of this case, which includes an alleged chronic failure by defendants to comply with Court ordered due process requirements, the findings and conclusions of the Monitor in the Report, and case law concerning the duty of a court to retain jurisdiction over an injunction until it is assured that changes have become permanent. Plaintiffs also point to defendants' alleged failure to comply with the Injunction in several areas unrelated to due process.[5] These factors, plaintiffs argue, illustrate that defendants will comply with the Injunction and the Constitution only under the impetus of a Court order and constant supervision by the Monitor. Further, they contend that a one year period for monitoring due process practices of defendants is not sufficient to ensure permanent compliance.

Defendants, in opposition, do not respond to nor oppose directly, plaintiffs' request to extend the period of the Court's jurisdiction. Instead, defendants argue there is no need for the Court to appoint a monitor to supervise compliance with constitutional requirements. *See* Report at ¶ 95. Defendants maintain that the Court can supervise its injunctive relief without a monitor simply by retaining jurisdiction to entertain any further proceedings.

The history of this case and the findings of the Monitor in the Report make it clear that defendants have failed to achieve adequate compliance with the requirements of due process. *See* Report at ¶¶ 13 and 80.[6]

---

**4.** The Report included a proposed Modification to the Judgment of Permanent Injunction. Plaintiffs request parallel modifications in the proposed modified injunction.

**5.** Plaintiffs provide two examples. First, defendants, during renovations of San Quentin's East Block, were planning to provide an exercise schedule for class members that did not comply with the standards of the Court's Injunction. Plaintiffs assert that it was only after repeated complaints by plaintiffs' counsel that defendants agreed to abide by the Injunction. The exercise schedule finally implemented was in compliance with the Injunction.

Plaintiffs also cite defendants' recent alleged failure to comply with the Injunction in October and November 1988, when the temperature in East Block fell below the 61 degree minimum

mandated in the Monitor's Reports. *See* Steven Fama Declaration, Exhibit C. This problem was caused by the renovation of East Block when existing windows were removed. Defendants' response was to issue extra blankets and thermal underwear to inmates. The Monitor, at plaintiffs' request, visited San Quentin to investigate the situation. At the time of the visit, defendants already had begun to put plastic over open windows and were installing a temporary heating system.

**6.** The Report at ¶ 80 summarizes:

Despite defendants' good intentions, the record establishes that during the past year, prisoners have been housed in segregation without evidence, that prisoners have been denied any meaningful opportunity to present their views concerning alleged gang affil-

The Monitor, however, was aware of the facts and background to this case when he recommended that the permanent injunction be set to continue for a period of one year, contingent upon a finding that due process violations by defendants are not continuing to recur with regularity during that period.[7]  *Id.* at ¶ 94.

■ Plaintiffs' motion to extend the period for the Court's continuing jurisdiction must be denied.  They do not dispute the Monitor's findings upon which his decision to extend the injunction for one year is predicated.  Further, the Monitor provided for the eventuality that defendants may not comply with the specified due process requirements.  The Report provides that the one year period for the Court's continuing jurisdiction may be extended if the Court should find that, during the year, due process violations continued with regularity.  *See* Report at ¶ 94.

The Monitor's provision that the Court's jurisdiction should be continued for one year, with the contingency that this period be extended should defendants fail to comply, is narrowly tailored.  *Toussaint,* 801 F.2d at 1087 (citing *Ruiz v. Estelle,* 679 F.2d 1115, 1156 (5th Cir.1982), *amended,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983)).  Such relief of extending jurisdiction for one year with the contingency to allow further extensions should the need arise is the least intrusive remedy that will achieve effective results, and the Monitor recognized as much.  Report at ¶ 92; *Id.* at 1086–87 (citing *Ruiz,* 679 F.2d at 1144–46).  Further, this provision continues the Court's supervisory power "until it can say with assurance that the unconstitutional practices have been discontinued and that there is no reasonable expectation that unconstitutional practices will recur."  *Battle v. Anderson,* 708 F.2d 1523, 1536 (10th Cir.1983), *cert. dismissed, Meachum v. Battle,* 465 U.S. 1014, 104 S.Ct. 1019, 79 L.Ed.2d 248 (1984).

### (2) Periodic Review of Segregation Decisions.

Plaintiffs urge that the Report be modified to require review of segregation decisions every 90 days instead of every 120 days.  Plaintiffs maintain that prison inmates in "indeterminate segregation"[8] should be reviewed for release from segregation at least every 90 days so that any changed circumstances which make the continued segregation of a prisoner unnecessary are recognized as quickly as possible.[9]

Defendants contend that review of segregation decisions every 120 days is sufficient, especially in light of defendants' heightened due process procedures.[10]

---

iations, that unsubstantiated polygraph examiner opinions have been relied upon to retain prisoners in segregation, and that the assignment of prisoners to segregation has not been reviewed with the periodic frequency required by the Constitution.

7.  The Monitor in the Report found "[t]here is no evidence that any defendant has willfully violated the due process rights of any prisoner.  In fact, defendants operate an elaborate system of procedures with every hope that it will prevent due process violations."  Report at ¶ 80.
    The Report, however, also states "[w]ithout further relief from this Court, defendants' voluntary efforts are unlikely to result in full compliance with the requirements of due process.  To the contrary, in the absence of further relief from the Court, it is likely that serious due process violations will continue to occur with some regularity."  *Id.* at ¶ 88.

8.  "Indeterminate SHU Segregation" refers to long-term lockup of prisoners in segregation for "administrative" reasons.  *See* 15 C.C.R. § 3341.5(c)(2)(A);  Report at ¶ 10.

9.  Plaintiffs explain by way of example that a prisoner placed in indeterminate segregation at San Quentin solely because of gang affiliation could be transferred to another institution where segregation would not be necessary.  Such a transfer, however, might happen only if the prisoner's placement in segregation was reviewed by a Classification Staff Representative (CSR), who could review the prisoner's file and determine that a transfer to another institution would allow the prisoner to be released from segregation while maintaining the security of San Quentin.  *See Toussaint,* 801 F.2d at 1105.

10.  *See* Report at ¶ 72 & n. 55.  Defendants note, as did the Monitor, *see* Report at ¶¶ 68–70, that their procedures provide for 30–day review of inmates on "temporary segregation" status, and also require defendants to review and evaluate each inmate on at least a weekly basis during his first two months in segregation, with contin-

Moreover, as to plaintiffs' argument concerning changing conditions which may affect an inmate's segregation status, defendants claim plaintiffs have made no factual showing justifying the need for 90–day reviews.

The Court's 1984 Injunction required defendants to review the basis for a prisoner's segregation after any twelve consecutive months of segregation. *Toussaint*, 597 F.Supp. at 1424. The Ninth Circuit held that such annual review does not sufficiently protect plaintiffs' liberty interest. *Toussaint*, 801 F.2d at 1101. The Ninth Circuit further stated that the frequency of periodic review is "for the parties to recommend and the district court to decide in the first instance." *Id.*

■ The Court decides that the segregated status of a prisoner must be re-

uous review by custodial and casework staff assigned to the housing unit. 15 C.C.R. § 3335(c), 3342(a). Thus, by the time review for an inmate placed in indeterminate segregation is extended to periods of 120 days, the inmate has been reviewed on numerous occasions. Defendants also state that the periodic hearings for inmates at San Quentin are more "formal" than the minimum "informal" hearing required by due process. The specific procedures to which defendants refer are: (1) written notice; (2) the opportunity to request witnesses; (3) written decisions routinely provided to prisoners.

11. Moreover, the Court notes, as did the Ninth Circuit, that the due process clause requires more than "meaningless gestures". *Toussaint*, 801 F.2d at 1102.

12. Defendants' first objection, for example, is to the Monitor's framing of the issue before the Court on remand:

The issue before the Court is whether or not prisoners have been confined in segregation in San Quentin or Folsom State Prisons in a manner forbidden by the Due Process Clause of the Fourteenth Amendment.

Report at Section II, p. 3, lines 6–9.

Defendants claim that the issues to be decided on remand of this case from the Ninth Circuit "are not as sweeping as whether or not members of the plaintiff class are confined in segregation in a manner forbidden by the Due Process Clause of the Fourteenth Amendment." Defendants' Objections to the Third Special Report at 2. Rather, defendants argue that the issue framed by the Ninth Circuit's directive was to determine whether defendants' segregation *procedures* meet the requirements of due process as stated in the opinion of the court of appeals.

viewed every 90 days to satisfy the requirements of due process. *See Tyler v. Black*, 811 F.2d 424, 429 (8th Cir.1987). No court has accepted a 120–day period between reviews of segregation decisions.[11]

**B. Defendants' Objections and Motion to Modify.**

Defendants' motion to modify the Report contains paragraph-by-paragraph objections, all of which were previously submitted to the Monitor. Defendants pose these numerous objections, some repetitive, based on semantic distinctions often lacking substance.[12] The objections refer both to alleged omissions of evidence that defendants argue should be in the Report as well as to alleged mis-characterizations in the Report of evidence in the record.[13]

The distinction defendants attempt to draw by this objection carries no weight of reason. The Ninth Circuit in *Toussaint* determined the rights of the plaintiff class under the Fourteenth Amendment. On remand, the Court is not limited to determining which of defendants' *procedures* meet the requirements of due process, while turning a blind eye to actual violations of due process when a prisoner is confined in segregation in a manner forbidden by that guarantee. Instead, as the Ninth Circuit expressly stated, if the Court determines "defendants' procedures do not meet the requirements [of due process], and that the defendants are unlikely to comply voluntarily, the [Court] shall order such relief as it deems *necessary* to obtain compliance." *Toussaint*, 801 F.2d at 1114. Moreover, the Ninth Circuit recognized that the Court is entitled to authorize the release of prisoners from segregation through the Monitor should the Court determine that the requirements of due process have not been met. *Id.* at 1102.

Thus, defendants objection to the Report's framing of the issue before the Court on remand yields a hollow distinction based on an erroneous interpretation of the Ninth Circuit's decision in *Toussaint.*

13. Defendants' objection to use of the word "assignment" in ¶ 13 of the Report is another example of an insignificant objection. The Report in referring to specific due process concerns lists:

(2) the *assignment* of prisoners to segregation on the basis of the Criminal Activities Coordinator's determination that prisoners are members of prison gangs or other similar groups;

(3) the *assignment* of prisoners to segregation on the basis of polygraph examiner opinions;

. . .

(Emphasis added).

The Court, having carefully reviewed each objection, addresses only those which merit consideration.

(1) Defendants object to ¶ 33 of the Report in which the Monitor finds that given the difficulties prison officials face in identifying gang members, "due process may require defendants to use special procedures when assigning prisoners to segregation based on prison gang membership ..." Defendants contend that the difficulty in assessing gang membership should lead the Court to exercise deference to the judgment of prison administrators, rather than usurp their perogatives by creating "special procedures".

Defendants' miss the point. The Report does not imply that the Court should usurp the role of prison officials. Rather, it suggests that the difficulties engendered by determining prison gang membership may create a need for special due process procedures to ensure compliance with constitutional requirements.

(2) Defendants object to ¶ 37 of the Report, stating it should be corrected to indicate that a prison staff member other than a Criminal Activities Coordinator (CAC) may make a gang identification and complete the CDC 812–A form. Plaintiff's pose no objection to defendants' suggested change. Accordingly ¶ 37 should be modified so that the following sentence is inserted after the second sentence:

> The CDC 812–A form may be completed by a CAC, as is the practice at San Quentin, or by a designated Investigative Lieutenant, as is permitted under CDC regulations.

The statement in (2) is accurate; however, the statement in (3) could be improved through use of the word "retention" in place of "assignment". The record indicates that polygraph examinations have been used during "debriefings" (when a prisoner is already in segregation) to determine whether a prisoner should be released into the prison's general population or *retained* in segregation.

Nevertheless, defendants' objection to use of the term "assignment" rather than "retention" is based more on semantics than substance. When prison officials determine that a prisoner already in segregation will continue to be so housed, the decision can be characterized accurately as one that continues the "assignment" of

(3) Defendants object to ¶¶ 46–48 of the Report. These paragraphs focus on the particular procedures required when a prisoner is assigned to indeterminate segregation based on suspected gang membership.

■ Defendants object first to the legal conclusion in the Report at ¶ 46 and procedures which follow from that conclusion, recommended by the Monitor in ¶ 47. The Monitor finds that there may be a greater impact on a prisoner's liberty interest when he is retained in segregation for an indeterminate period, based upon suspected gang membership, than when a prisoner is confined in segregation for a definite short period. *See Mims v. Shapp,* 744 F.2d 946, 951–52 (3d Cir.1984); *cf. Hewitt v. Helms* 459 U.S. 460, 472–73, 103 S.Ct. 864, 871–72, 74 L.Ed.2d 675 (1983). Further, the Monitor concludes that the need of prison officials to act swiftly is diminished when the prisoner is already in segregation. To determine the quantum of process due when a state creates a liberty interest in freedom from segregation, the courts balance private and governmental interests, and consider the value of additional safeguards. *See Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872; *Toussaint,* 801 F.2d at 1098; *Mims,* 744 F.2d at 950. Thus, the Monitor in ¶ 47 concludes that because indeterminate segregation can give rise to heightened private interest[14], *Mims,* 744 F.2d at 950–51, while the government interest may be correspondingly lower if the prisoner is already in segregation when the decision to place the prisoner on "indeterminate" status is made, due process requires the procedures listed in that paragraph.[15]

a prisoner to segregation. In any event, the Monitor's use of the term "assignment" cannot be considered clearly erroneous.

**14.** The Ninth Circuit did not consider the impact on a prisoner's liberty interest when he is to be retained in segregation indefinitely. *See Toussaint,* 801 F.2d at 1099–1100.

**15.** ¶ 47 provides that due process requires that (1) the prisoner should be afforded the opportunity to present his views to the CAC prior to any decision to retain the prisoner in segregation for an indeterminate period, or for any period exceeding 30 days, based on gang membership; and (2) the CAC must designate the prisoner as

Defendants' objections to the Monitor's findings of fact and conclusions of law in ¶¶ 46–48 must fail. None of the findings of fact can be deemed clearly erroneous. They are based upon sound legal analysis. Further, the procedures established in ¶ 47 concerning the CAC's role in designating a prisoner as a member of a prison gang are proper given the findings in the record which indicate that at San Quentin it is the CAC who makes the critical determination, for purposes of assignment of a prisoner to indeterminate segregation, when designating a prisoner as a gang member. Report at ¶¶ 37–40.

The procedures in ¶ 47 eliminate a Catch–22 problem in existing procedures which allowed a prisoner to be assigned to indeterminate segregation based on suspected prison gang membership without being given an opportunity to present his views to the CAC, and without any CAC determination that he is, indeed, a prison gang member.[16] Report at ¶¶ 37, 41 and 48. The Court agrees with the Monitor that such failures by defendants violate due process. *Id.; Mims* 744 F.2d at 952–54.

■ (4) Defendants object to the second sentence of ¶ 53 which states "[a]t San Quentin, defendants have consistently relied in this way upon the opinions of polygraph examiners, without any scientific basis. [footnote omitted]" The sentence refers to defendants reliance on polygraph examinations "as the basis for finding facts which constitute the predicate for depriving the inmate of a liberty interest." Report at ¶ 53.

This finding by the Monitor is supported by the record. The defendants when given the opportunity to present any relevant evidence concerning their basis for reliance on polygraph opinions failed to do so. Defendants' have the burden to meet the due process requirement of having "some evidence in the record" to support a segregation decision, and that evidence must have "some indicia of reliability". *Cato v. Rushen,* 824 F.2d 703, 705 (9th Cir.1987); *Toussaint,* 801 F.2d at 1104. Defendants have not shown that information obtained from polygraph examinations has some indicia of reliability. No federal court has sanctioned reliance by prison officials on a polygraph examiner's opinions as the basis for depriving a prisoner of his liberty interest. Report at ¶ 53.

The Monitor's legal conclusion is correct. The due process clause forbids defendants from relying on a polygraph examiner's opinion as to the truthfulness of a prisoner's denial of prison gang membership, or prisoner's answer to any related question, as the basis for assigning the prisoner to segregation. Report at ¶ 54.

■ (5) Defendants object to the conclusion in ¶ 60 that "due process requires that defendants, when considering the segregation of an inmate based on confidential information, must inform the inmate of as much of the relevant content of that information as possible consistent with the nondisclosure of the source of information." The Ninth Circuit in *Toussaint* held that, *inter alia,* due process requires that "prison officials must inform the prisoner of the charges against the prisoner or their reasons for considering segregation." 801 F.2d at 1100. The conclusion of the Monitor in ¶ 60 follows directly from the Ninth Circuit's directive as to what due process requires.

■ (6) Defendants challenge ¶ 90 of the Report for its conclusion that individual lawsuits by prisoners have little potential for curing due process violations at San

---

being a current active member of a prison gang prior to any ICC decision to retain the prisoner in segregation for an indeterminate period, or for any period exceeding 30 days; (3) the CAC must reevaluate his designation that a prisoner in segregation is a member of a prison gang every 90 days.

**16.** The problem resulted both because (1) long delays occurred before the CAC would evaluate the gang "status" of a prisoner who had been assigned to segregation by the Institutional Classification Committee (ICC) for suspected gang membership, and (2) an ICC decision to assign a prisoner to indeterminate segregation is virtually always based on the CAC evaluation of a prisoners' gang status, which evaluation is made without the prisoner being afforded an opportunity to present his views to the CAC.

Quentin. This conclusion is based on (1) the past history of this case, and (2) the inability of federal civil rights relief or the state habeas remedy to curtail in a timely manner due process violations of the kind found in the Report.

The Monitor properly considered the past history of this case, and logically did so, to determine if defendants will or can voluntarily comply with the minimal due process requirements that are imposed by the Court. *See Battle* 708 F.2d at 1538 (the court must exercise supervisory power over a matter until it can say with assurance that the unconstitutional practices have been discontinued and that there is no reasonable expectation that they will recur).

With regard to the civil rights and habeas actions, regardless of their potential efficacy, each can take a significant period of time, as noted by the Monitor. Wrongful confinement in segregation, however, is relatively transitory in nature. Report at ¶ 90. Thus, the Report's finding that these remedies will not sufficiently cure due process violations at San Quentin, given the circumstances of this case, is well supported by the record and law.

■ (7) Defendants challenge the finding in ¶ 93 that "[u]nder the circumstances presented in this case, a system of individual case review is the only effective means of remedying continuing due process violations." The Report recommends that the Court, in exercising continuing jurisdiction, should entertain requests on behalf of individual prisoners for review of decisions to assign prisoners to segregation for "administrative" reasons. The Ninth Circuit has approved the inclusion of such a process of Court review in the framing of relief, so long as the review process is necessary to obtain compliance with the requirements of due process. *Toussaint*, 801 F.2d at 1103. Further, the Ninth Circuit recognized that the Court could authorize a monitor to hear such reviews. *Id.; see* Report at ¶ 95. The appointing of a monitor to supervise and coordinate the action of prison officials to effectuate full compliance with the constitution "is especially appropriate for cases

such as this challenging conditions of prison confinement." *Williams v. Lane*, 851 F.2d 867, 884 (7th Cir.1988).

Accordingly,

IT IS HEREBY ORDERED that:

(1) plaintiffs' motion to strike the Declaration of Louis Dentici is GRANTED;

(2) plaintiffs' motion to modify the Report to extend the period of the Court's continuing jurisdiction from one to two and a half years is DENIED;

(3) plaintiffs' motion to modify the Report to provide for review of indeterminate segregation decisions every 90 days is GRANTED;

(4) defendants' motion to modify the Report is DENIED, except that ¶ 37 of the Report is amended so that the following sentence is inserted after the second sentence in that paragraph:

"The CDC 812–A form may be completed by a CAC, as is the practice at San Quentin, or by a designated Investigative Lieutenant, as is permitted under CDC regulations."

In all other respects, the Court ADOPTS the Monitor's Third Special Report.